UNITED STATES of America, Plaintiff,

v.

Kenneth CHARBONNEAU, Defendant.

No. CR–2–97–83.

United States District Court,
S.D. Ohio,
Eastern Division.

Sept. 30, 1997.

Deborah Solove, Columbus, OH, for Plaintiff.

Steve Brown, Columbus, OH, for Defendant.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter is before the Court on two motions to suppress filed by Defendant and the responses to these motions filed by the government. Defendant first moves the Court to suppress oral statements made by Defendant at the Port Columbus International Airport ("the airport") on the night of December 11, 1996. Second, Defendant moves the Court to suppress (1) any statements made by Defendant while on the Internet using the America OnLine ("AOL") computer service; (2) any physical evidence seized during a search of Defendant's residence; and (3) any physical evidence resulting from Defendant's "conversations" while using AOL. The Court held an evidentiary hearing on these motions on September 17, 1997. For the reasons stated below, the Court **GRANTS** Defendant's first motion to suppress the oral statements made at the airport because the Court finds that Defendant was subjected to a custodial interrogation without being given his *Miranda* warnings. The Court **DENIES** Defendant's second motion to sup-

press statements and physical evidence because the Court finds that Defendant had no reasonable expectation of privacy while using AOL and because the items seized at Defendant's residence would have been inevitably discovered.

## I. Facts

In making its decision, the Court finds the following facts. Early in 1994, federal law enforcement agents began an investigation into child pornography on the Internet. The investigators included D. Douglas Rehman of the Florida Department of Law Enforcement assigned to an FBI task force in Orlando, Florida. (Tr. at 39–41.) Agent Rehman would "go on-line," using the America On-Line Internet service, and pose as a pedophile.[1] Using the screen or user name of "Mikey1L", Agent Rehman would enter private AOL chat rooms and observe the on-line conversations between users. Agent Rehman operated primarily in the private chat rooms, "BOYS" and "PRETEEN." Both private chat rooms (maintained by private users and not by AOL) contained many users interested in trading graphic files with pictures of child pornography. (Tr. at 44–50.)

After entering a chat room, Agent Rehman would "record" the "conversations" as they occurred in the private room. The government offered Exhibit 4 as an example of one such conversation. Agent Rehman was not active in these conversations but passively "sat" in the rooms as an observer. In the course of his investigation, Agent Rehman observed the transmission of numerous graphic pictures containing child pornography. (*Id.*)

The child pornography was distributed by one user using a "list." A user generally would create the list by identifying all users in a private room; the user then would enter the screen names of the identified users onto an "e-mail" message and create a list of recipients. The sender of the pornographic pictures would next send an e-mail to the recipients identified on the list. The e-mail often would contain a brief message and an attached graphic file containing child pornography. Recipients frequently recycled the list so that every user on a list could trade graphic files with each other. Because Agent Rehman was present in the private chat rooms, users would include his screen name on such lists. Agent Rehman then would receive the same pornographic pictures of children as the other recipients on the list. (Tr. at 42, 49–50.)

One of the users that Agent Rehman observed sending child pornography was a user identified as "Charbyq." (Tr. at 49.) Through the use of a search warrant, the FBI in Virginia identified this user as Defendant. Consequently, the FBI learned that Defendant lived in the Columbus area and referred the investigation to its Columbus office. Special Agent Bevin Staufer of the Columbus office led the investigation for the FBI using the Violent Crime/Safe Streets Task Force. The task force consisted of various local and federal law enforcement officials. With all of the information about Defendant's activities on AOL, on December 10, 1996, Agent Staufer sought a search warrant for Defendant's residence at 5686 Wilcox Road, Dublin, Ohio. (Tr. at 61–63.)

The next day, December 11, the task force, armed with the search warrant, went to Defendant's residence; however, neither Mrs. Charbonneau nor her husband were home. At least six agents then proceeded to Dublin Coffman High School; Defendant's eighteen year old son Brent attended this school. When the agents arrived, they also discovered that Debra Charbonneau, Defendant's wife, worked at the school. Agents, dressed in jeans and t-shirts, then located Brent and Debra and questioned the two in separate rooms about Defendant's activities.[2] (Tr. at 64, 66–69, 91.)

Agent Staufer and another agent interviewed Debra. Agent Staufer told Mrs. Charbonneau that her husband had committed the crime of transmitting child pornogra-

---

1. For more information on AOL and its operation, see *United States v. Maxwell*, 45 M.J. 406, 411–13 (Armed Forces 1996). Because the Court of Appeals for the Armed Forces described the operation of AOL in such a concise manner, the Court will not describe the particulars of the Internet and AOL in this Opinion and Order unless necessary.

2. The Court did not hear any evidence regarding Brent's interview and does not know why agents interviewed Brent.

phy and that she was not under suspicion. Agent Staufer also told Mrs. Charbonneau that the FBI had a search warrant that would be executed if she did not sign a consent-to-search form. Agents spoke with Mrs. Charbonneau for approximately an hour and a half. (*Id.*) During the course of the interview, Mrs. Charbonneau learned that the agents were also questioning her son, Brent. Brent was not able to speak to his mother, however, until after the interview concluded. Although Agent Staufer testified that Mrs. Charbonneau was not upset, Mrs. Charbonneau testified that she was very upset and cried. Agent Staufer also testified that Mrs. Charbonneau understood that she could refuse to sign the consent-to-search form. Mrs. Charbonneau testified that the agents told her that they would "go easier" on her and her husband if she signed. Further, the agents told her that, in order to execute the search warrant, they would have to break down her door if she did not sign the consent form. Sometime during the course of the questioning, Mrs. Charbonneau signed the consent form. (Tr. at 85–90.)

At the conclusion of the interview, agents told Debra to drive her car to her home and wait for the agents to arrive. Upon the agents' arrival, Mrs. Charbonneau let them inside her home. Though the agents still had the search warrant, they never executed it. Instead, the agents relied on Mrs. Charbonneau's signed consent form as their justification to enter the Charbonneau residence. In an apparent show of force, six agents scoured the house for more than an hour. During the search, agents recovered two computers and a number of disks containing child pornography. After giving Debra a written list of all the items taken in the search, agents left the Charbonneau residence. (Tr. at 95–98.)

In the meantime, other agents assigned to the task force learned that Defendant was out of town on business and would be arriving back in Columbus on a flight that night. Four agents drove to Port Columbus and met Defendant as he got off the plane at around 11:00 p.m. Defendant exited the plane with five of his co-workers, including his supervisor. As soon as Defendant stepped off the plane, two agents, including Agent Staufer, approached Defendant and asked him to talk in private because of the delicate nature of the situation. Defendant agreed. One of Defendant's co-workers thought Defendant was being attacked and in danger. This co-worker decided to confront the agents. The agents allegedly forced the co-worker away and told him to leave. (Tr. at 100–103.)

The four agents then surrounded Defendant and escorted him into a back room of the airport used by the airport police. (*Id.*) The agents took Defendant to a police roll call room, located in the Airport Police Facility off the airport's main corridor. Defendant sat in the corner with two agents in front of him and two agents to the side of him. (Tr. at 34–36.)

Agents questioned Defendant for over an hour from 11:30 p.m. until after 1:00 a.m. The agents never advised Defendant of his *Miranda* rights. The agents claim, however, that they told Defendant that he was free to leave at any time. The agents also claim that they warned Defendant that the questioning "could take some time." (Tr. at 36–37, 75.)

During the interrogation, Defendant was allowed to use the bathroom. Defendant was escorted to the bathroom by an airport police officer because the back police area is off-limits to the public and because the airport was not open at the late hour. The officer allegedly followed Defendant into the bathroom and stood with his back to Defendant's bathroom stall. Although the officer was not a federal agent, Defendant felt uncomfortable with the officer watching him. (Tr. at 102–103.)

The agents never arrested Defendant during his interrogation. Instead, the agents told Defendant about the evidence they had against him and showed him a picture allegedly taken from his computer. One of the agents told Defendant that he had a problem and needed counseling. Agents also told Defendant that he needed to admit his problem. At some point during the questioning, Defendant confessed to the crime of possessing child pornography. (Tr. at 76–78, 108.)

One of Defendant's co-workers originally volunteered to give Defendant a ride home.

After initially waiting for Defendant, the co-worker was told to leave upon the promise that Defendant would get a ride home. After agents finished questioning Defendant, Agent Staufer drove Defendant home. (Tr. at 78, 105–106.)

A few days later, Defendant called Agent Staufer and told the agent his AOL password. Apparently, Defendant forgot the password during the airport questioning. Agents told Defendant that should he remember the password, he should contact them and give them his password. Defendant also told Agent Staufer that he had made appointments for counseling and that he expected to put this whole incident behind him. (Tr. at 77–78, 110–111.)

## II. Motion to Suppress Oral Statements Made at the Airport

Defendant moves to suppress his confession at the airport on Fourth, Fifth and Sixth Amendment Grounds. Although Defendant does not specifically state his reasoning, Defendant's theory of suppression is apparently that his confession was the result of an illegal custodial interrogation. The government responds by claiming that Defendant's statements were voluntary and that Defendant was not in custody. Thus, the government claims *Miranda* warnings were not necessary.

The Supreme Court in *Miranda v. Arizona* held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates that use of procedural safeguards effective to secure the [Fifth Amendment] privilege against self-incrimination." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). The government bears the burden of proof by a preponderance of the evidence on proving both that Defendant's confession was voluntary and that *Miranda* warnings were not necessary. *See Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986). If the government fails to meet its burden, Defendant's statement must be suppressed. *Cf. id.*

### A. Custody

■ The Court must first decide whether Defendant was in custody during the airport interrogation. Fifth Amendment *Miranda* warnings are required where a suspect is arrested or is subjected to restraint on freedom of movement associated with a formal arrest. *See United States v. Sangineto–Miranda,* 859 F.2d 1501, 1515 (6th Cir.1988). A court making an inquiry into a suspect's freedom of movement determines whether the suspect is "in custody" for purposes of receiving *Miranda* protection. *See California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam). The Supreme Court has held that the test to determine if a suspect is "in custody" is an objective one: would a reasonable person in the defendant's position have felt that he was under arrest or was "otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 477, 86 S.Ct. at 1629. Recent Supreme Court cases have clarified that custody is to find more than just the fact that questioning of a defendant occurred in a "coercive environment." *See State of Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 713–14, 50 L.Ed.2d 714 (1977) (per curiam). Instead, the Supreme Court has held that there must be "such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." *Id.*

In this case, the Court concludes that Defendant was in custody at the airport. Although the case agents insisted that Defendant was free to leave, Defendant's freedom was so restricted that he was in custody. Four agents surrounded Defendant upon his disembarkation from the plane. Their presence was so coercive that one of Defendant's business associates became alarmed that Defendant was being attacked. Although the Court does not necessarily believe that Defendant's associate was physically accosted, nevertheless the agents' show of force was enough to convince Defendant that he had no choice but to follow the agents into the back rooms of the airport. Agents escorted Defendant to a back room of the airport and seated in the corner of a police roll call room. Defendant was surrounded by four agents who continually questioned him. In sum, the agents' actions demonstrate that Defendant

was not in the room voluntarily. Therefore, Defendant was in custody at the airport.[3]

## B. Interrogation

■ The determination of custody does not end the inquiry, however. To determine if Defendant's statements should be suppressed, the Court must determine if the questioning by the agents constituted an "interrogation." The Supreme Court stated that interrogation is "any words or actions on the part of the police that the police know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). The Supreme Court stated that the key to a determination of whether police conduct constituted an interrogation turned on "a defendant's perception of the police conduct and, as measured from the police perspective, the reasonable likelihood that such conduct would illicit an inculpatory response." *United States v. Thompson*, No. 95–5881, 1996 WL 428418 at *4 (6th Cir. July 30, 1996) (discussing *Innis*, 446 U.S. at 301 & n. 7, 100 S.Ct. at 1690 & n. 7); *see also United States v. Soto*, 953 F.2d 263, 264–65 (6th Cir.1992).

In this case, the case agents interrogated Defendant. When the agents interviewed Defendant, they had already seized Defendant's computer. Agents told him that they knew he was guilty and that he could get counseling for his crime. The agents questioned Defendant for over an hour. They showed him the evidence they had gathered against him. They sat Defendant in a corner and continued to question him. Defendant testified that he was told to admit that he had a problem. From all of the evidence, the Court finds that the agents reasonably knew that their questioning would illicit an incriminating response from Defendant. Yet the agents never advised Defendant of his Fifth Amendment rights. As a result, the Court finds that under the circumstances, the government has failed to prove by a preponderance of the evidence that Defendant was not subjected to a "custodial interrogation" and was not entitled to be advised of his *Miranda* rights. Accordingly, Defendant's oral statements made to the police are not admissible at trial.

## C. Voluntariness of Statements

■ The government attempts to avoid the consequences of *Miranda* by claiming that Defendant's statements were voluntary. The Fifth Amendment, however, prohibits the government's use of a defendant's compelled testimony. *See Oregon v. Elstad*, 470 U.S. 298, 306–07, 105 S.Ct. 1285, 1291–92, 84 L.Ed.2d 222 (1985). An admission is deemed to be coerced when the conduct of law enforcement officials overbears the will of the accused. *See Beckwith v. United States*, 425 U.S. 341, 347–48, 96 S.Ct. 1612, 1616–17, 48 L.Ed.2d 1 (1976) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961)). An involuntary confession may result from psychological, no less than physical, coercion by law enforcement officials. *See Arizona v. Fulminante*, 499 U.S. 279, 285–89, 111 S.Ct. 1246, 1251–54, 113 L.Ed.2d 302 (1991); *Miranda*, 384 U.S. at 448, 86 S.Ct. at 1614. Not all psychological tactics are unconstitutional. Instead, the Sixth Circuit instructed district courts to look at the totality of the circumstances to determine if a confession was elicited by unconstitutional means. *See Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir.1994), *cert. denied*, 515 U.S. 1145, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995). Specifically, the Sixth Circuit said that the district court examining the totality of the circumstances must deter-

---

**3.** The Court notes that this case is not like the drug courier cases where suspected drug couriers have been asked to step into back rooms of the airport for questioning. *See Florida v. Rodriguez*, 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984); *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Knox*, 839 F.2d 285 (6th Cir.1988). In those cases, case agents became suspicious of individuals exiting a plane and detained the individuals for questioning. Each court in these drug courier cases held that the "temporary detentions" that resulted from agents questioning the couri-

ers were akin to *"Terry* stops" (*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). *See Rodriguez*, 469 U.S. at 5, 105 S.Ct. at 310–11; *Royer*, 460 U.S. at 498–99, 103 S.Ct. at 1324–25; *Knox*, 839 F.2d at 292–93. In this case, the government had already targeted Defendant. Agents already had gone to his residence and seized evidence against him. In no way was Defendant detained as a result of a *Terry* stop. Thus, the drug courier cases are inapplicable to the case at bar; Defendant was clearly in custody.

mine "whether a defendant's will was overborne in a particular case." *Id.* (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)). Factors to consider in assessing the totality of the circumstances include: the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. *See Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047. The Supreme Court specifically held that the lack of *Miranda* warnings is an important factor in determining whether coercion was present. *See United States v. Watson,* 423 U.S. 411, 425, 96 S.Ct. 820, 828–29, 46 L.Ed.2d 598 (1976); *see also, United States v. Crowder,* 62 F.3d 782, 788 (6th Cir.1995), *cert. denied,* — U.S. ——, 116 S.Ct. 731, 133 L.Ed.2d 682 (1996).

In examining the totality of the circumstances surrounding the interrogation of Defendant, the Court finds that Defendant's confession was involuntary. Specifically, Defendant was interrogated for over an hour without being informed of his constitutional rights to counsel and his right to not incriminate himself under the Fifth Amendment. Further, the case agents interrogated Defendant for over an hour in the late evening from 11:30 p.m. to 1:00 a.m. Defendant had just returned from a business trip to Columbus when agents interrogated him. Defendant was tired and was not used to being interrogated. As a result, Defendant's confession was involuntary. *Cf. Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963).

The Court is aware of the Sixth Circuit's express approval of late-night interrogation in *Hawkins v. Lynaugh,* 844 F.2d 1132, 1140 (5th Cir.1988). *See Ledbetter,* 35 F.3d at 1069. The Sixth Circuit also stated, however, that the key to determining whether a confession was involuntary involves examining the *Schneckloth* test of "whether a defendant's will was overborne." *Ledbetter,* 35 F.3d at 1070. In this case, agents were able to extract a confession from Defendant through their coercive behavior.

Therefore, upon consideration of all the issues raised by both parties, the Court finds that Defendant's statements are not admissible at trial. Accordingly, the Court **GRANTS** Defendant's motion to suppress.

■ In order to avoid a similar argument at trial, the Court also will suppress Defendant's phone call to the FBI agents five days after his interrogation because the taint of the illegal arrest was not removed. *See Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963). When Defendant called, he was responding to the agents earlier questioning; his call was not voluntarily made.

### III. Motion to Suppress Statements and Physical Evidence

In Defendant's motion to suppress physical evidence and statements, Defendant requests that this Court suppress three different items. First, Defendant moves to suppress any statements made by Defendant while on the Internet using the AOL computer service. Defendant claims that the government violated his First and Fourth Amendment rights relating to both the expectation of privacy and the right of free speech while using AOL. Second, Defendant moves to suppress any physical evidence seized during a search of Defendant's residence on the Fourth Amendment ground that the evidence was obtained by an illegal seizure. Third, Defendant moves to suppress any physical evidence resulting from Defendant's "conversations" using AOL on First and Fourth Amendment grounds relating to (A) free speech on AOL, (B) the illegal seizure of the conversations, and (C) the expectation of privacy while on AOL. Because the first and third requests are so interrelated, the Court will examine the issues relating to AOL at the same time.

In response to Defendant's AOL claims, the government claims that Defendant's conversations on AOL were not private and should not be afforded any constitutional protection. In response to Defendant's illegal seizure claims, the government claims that Mrs. Charbonneau voluntarily consented to a search of the Charbonneau residence; further, even if her consent was involuntary, the

government claims that agents would have inevitably discovered the incriminating evidence.

■ The Court finds that, with respect to Defendant's AOL claims, first Defendant had no First Amendment rights when using AOL to transmit child pornography. Second, Defendant did not have a reasonable expectation of privacy while using AOL. The Court also finds that the search of Defendant's home was illegal but the evidence seized during that search is admissible under the doctrine of inevitable discovery.

## A. Statements on AOL

Before analyzing Defendant's Fourth Amendment grounds, the Court will examine Defendant's First Amendment free speech claim. As Defendant's First Amendment claims were not adequately supported by case law, the Court dismisses Defendant's First Amendment claims as meritless. *Cf. New York v. Ferber*, 458 U.S. 747, 757, 759, 102 S.Ct. 3348, 3354–55, 3355–56, 73 L.Ed.2d 1113 (1982); *United States v. Langford*, 688 F.2d 1088, 1097 (7th Cir.1982); *United States v. Tolczeki*, 614 F.Supp. 1424, 1429–30 (N.D.Ohio 1985).

■ The Court will next examine Defendant's Fourth Amendment grounds for challenging the seizure of Defendant's AOL conversations. A person challenging the validity of a search or seizure may only assert a "reasonable" "subjective expectation of privacy." *See Minnesota v. Olson*, 495 U.S. 91, 95, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990). As another court addressing a very similar issue found, this Court finds that Defendant possessed a limited reasonable expectation of privacy in the e-mail messages he sent and/or received on AOL. *Cf. United States v. Maxwell*, 45 M.J. 406, 417 (Armed Forces 1996). E-mail is almost equivalent to sending a letter via the mails. When an individual sends or mails letters, messages, or other information on the computer, that Fourth Amendment expectation of privacy diminishes incrementally. *Cf. id.; Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921). Furthermore, the openness of the "chat room" diminishes Defendant's reasonable expectation of privacy. *Cf. Maxwell*, 45 M.J. at 417.

■ As the *Maxwell* court noted:

E-mail transmissions are not unlike other forms of modern communication. We can draw parallels from these other mediums. For example, if a sender of first-class mail seals an envelope and addresses it to another person, the sender can reasonably expect the contents to remain private and free from the eyes of the police absent a search warrant founded upon probable cause. However, once the letter is received and opened, the destiny of the letter then lies in the control of the recipient of the letter, not the sender, absent some legal privilege.

Similarly, the maker of a telephone call has a reasonable expectation that police officials will not intercept and listen to the conversation; however, the conversation itself is held with the risk that one of the participants may reveal what is said to others.

Drawing from these parallels, we can say that the transmitter of an e-mail message enjoys a reasonable expectation that police officials will not intercept the transmission without probable cause and a search warrant. However, once the transmissions are received by another person, the transmitter no longer controls its destiny.

*Maxwell*, 45 M.J. at 418. Thus an e-mail message, like a letter, cannot be afforded a reasonable expectation of privacy once that message is received.

■ Moreover, a sender of e-mail runs the risk that he is sending the message to an undercover agent. In *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), the Supreme Court held that statements made to undercover agents are not protected by the Fourth Amendment. In *Hoffa*, labor leader James "Jimmy" Hoffa admitted guilt in a conversation overheard by the government's undercover informant. *See id.* at 296 & n. 3, 87 S.Ct. at 410 & n. 3. The Court found that no Fourth Amendment rights exist where "a wrongdoer's misplaced belief that a person to whom he voluntarily

confides his wrongdoing will not reveal it." *Id.* at 302, 87 S.Ct. at 413. Indeed, "The risk of being overheard by an eavesdropper ... or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak." *Id.* at 303, 87 S.Ct. at 414 (quoting *Lopez v. United States,* 373 U.S. 427, 465, 83 S.Ct. 1381, 1401–02, 10 L.Ed.2d 462 (1963) (Brennan, J., dissenting)).

 The expectations of privacy in e-mail transmissions depend in large part on both the type of e-mail sent and recipient of the e-mail. *See Maxwell,* 45 M.J. at 419. E-mail messages sent to an addressee who later forwards the e-mail to a third party do not enjoy the same reasonable expectations of privacy once they have been forwarded. *Cf. id.* Similarly, "Messages sent to the public at large in the 'chat room' or e-mail that is 'forwarded' from correspondent to correspondent lose any semblance of privacy." *Id.*

 In this case, Defendant wishes to suppress all of the statements made in AOL chat rooms. All of the evidence gathered by the FBI from the chat rooms resulted from the presence of undercover agents in the rooms. Clearly, when Defendant engaged in chat room conversations, he ran the risk of speaking to an undercover agent. Furthermore, Defendant could not have a reasonable expectation of privacy in the chat rooms. Accordingly, the e-mail sent by Defendant to others in a "chat room" is not afforded any semblance of privacy; the government may present the evidence at trial. In addition, all e-mail sent or forwarded to the undercover agents is not protected by the Fourth Amendment. Therefore, the Court **DENIES** Defendant's motion to suppress as it relates to any statements made on AOL and any physical evidence that resulted from transmissions made by Defendant on AOL.

### B. Evidence Seized at Defendant's Residence

 The Court will next examine Defendant's motion to suppress as it relates to the evidence seized at Defendant's residence. It is well-settled law that a search conducted without the execution of a warrant is "per se unreasonable" and "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). Further, one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. *See Davis v. United States,* 328 U.S. 582, 593–94, 66 S.Ct. 1256, 1261–62, 90 L.Ed. 1453 (1946). When the government seeks, however, to "rely upon consent to justify the lawfulness of a search, [the government] has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968).

The Supreme Court defined the test for whether a person's consent was voluntary by referencing a prior holding defining a "voluntary" confession. Quoting an earlier case, the Supreme Court stated:

> The ultimate test remains that which has been the only clearly established test in Anglo–American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Id.* (quoting *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961)).

 Similarly, the Supreme Court has used the totality of the circumstances test to determine whether a consent was voluntary. *Cf. id.* at 226, 93 S.Ct. at 2047. "[I]t is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced." *Id.* at 233, 93 S.Ct. at 2050. Some of the factors to consider in using the totality of the circumstances include: the age, education, intelligence of the person consenting; the presence of physical punishment or credible threats of violence; overreaching by the police; whether the defendant was under the influence of drugs or alcohol; and whether defendant was informed of his constitutional

rights. *Cf. id.* The presence or absence of a single consensual or coercive factor is not of itself controlling as a matter of law. *See United States v. Edmond,* 413 F.Supp. 1388, 1391 (E.D.Mich.1976). Instead, the court must "carefully sift the unique facts and circumstances of the case before it to determine whether the coercive factors ... outweigh the noncoercive ones." *Id.*

In this case, the Court finds that the coercive factors outweigh the noncoercive factors. Specifically, the factors tending to establish an involuntary and coercive consent include: (a) the presence of over six agents at Dublin Coffman High School to question Debra Charbonneau and Brett Charbonneau; (b) the interrogation of Mrs. Charbonneau and her state of mind during the interrogation; (c) the threats made by the agents that they would have to forcibly enter her home by breaking down her front door if she failed to consent to the search; (d) the length of the interrogation of Mrs. Charbonneau by the agents; and (e) the simultaneous interrogation of her son Brent in a nearby room.

When a court examines the totality of the circumstances to determine whether a consent was voluntary, the Supreme Court counseled that "account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth,* 412 U.S. at 229, 93 S.Ct. at 2049. Further, the evidence of voluntary consent must be "proved by clear and positive testimony" and "must be unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion." *United States v. Hearn,* 496 F.2d 236, 243–44 (6th Cir.1974) (quoting *Schneckloth,* 412 U.S. at 229, 93 S.Ct. at 2048–49; *Amos v. United States,* 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921); *Simmons v. Bomar,* 349 F.2d 365 (6th Cir.1965)).

From all of the evidence presented, the Court finds that the government has failed to show that Debra Charbonneau's consent was "unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion." *Hearn,* 496 F.2d at 243–44.

 The government contends that even if Mrs. Charbonneau's consent was not voluntary, under the doctrine of inevitable discovery, the search was nonetheless valid. The inevitable discovery doctrine is a means by which the government can show that evidence that might be excluded because of some unconstitutional conduct nonetheless should be admissible. *Cf. Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 2508–09, 81 L.Ed.2d 377 (1984). The inevitable discovery doctrine requires the court to speculate as to what would have occurred absent the illegal conduct. "Speculation, however, must be kept to a minimum; courts must focus on 'demonstrated historical facts capable of ready verification or impeachment.'" *United States v. Leake,* 95 F.3d 409, 412 (6th Cir.1996) (quoting *Nix,* 467 U.S. at 455 n. 5, 104 S.Ct. at 2515 n. 5). The burden of proof is on the government to establish that illegal evidence "would have been discovered by lawful means." *Nix,* 467 U.S. at 444, 104 S.Ct. at 2509.

In *United States v. Kennedy,* 61 F.3d 494, 498–500 (6th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996), the Sixth Circuit discussed the doctrine of inevitable discovery. The doctrine applies when the "government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence would have inevitably been discovered." *Id.* at 499. In other words, the Court must determine "what would have happened had the unlawful search never occurred." *Id.* at 498 (quoting *United States v. Eng,* 971 F.2d 854, 861 (2d Cir.1992)).

In *Kennedy,* the Sixth Circuit held that the government can meet its burden of showing that the tainted evidence would be discovered through lawful means by showing that routine or standard police practices would have revealed the evidence. *See id.* at 500. In this case, the Court finds that the items seized would have been inevitably discovered through the execution of the search warrant. Although this Court believes that the FBI agents did not behave in an appropriate manner when they dealt with Mrs. Charbonneau, the fact remains that the agents did have a search warrant that they could have executed upon their arrival at the Charbonneau residence. Defendant does not challenge the

sufficiency of that warrant and the Court sees no reason to conclude that the warrant is deficient. Executing a valid search warrant is a routine police practice. Therefore, even if Mrs. Charbonneau had not consented to a search, the agents would have legally discovered the evidence by executing the warrant.

Consequently, the evidence seized at the Charbonneau residence is admissible pursuant to the inevitable discovery exception to the exclusionary rule. *Cf. id.* at 501; *United States v. Norman,* No. 95–4225, 1997 WL 295345, at *3 (6th Cir. June 2, 1997). Therefore, the Court **DENIES** Defendant's motion to suppress as it relates to any evidence seized at Defendant's residence.

### IV. Conclusion

Upon consideration and being duly advised, the Court **GRANTS** Defendant's motion to suppress the oral statements made at the airport and **DENIES** Defendant's motion to suppress statements and physical evidence.

**IT IS SO ORDERED.**