J-A14002-15

2015 PA Super 143

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| CURTIS DOVAL DIEGO, | |
| Appellee | No. 1989 MDA 2014 |

Appeal from the Order Entered October 28, 2014
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0001203-2013

BEFORE:  BENDER, P.J.E., JENKINS, J., and STRASSBURGER, J.[*]

OPINION BY BENDER, P.J.E.:  **FILED JUNE 23, 2015**

The Commonwealth appeals from the trial court's order granting Curtis Doval Diego's (Appellee) suppression motion based on purported violations of the Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S. § 5701 et seq. ("Wiretap Act" or the "Act").  The Commonwealth contends that an iPad is not a "device" as that term is defined under the Wiretap Act, and that Appellee's text messages were not "intercepted" within the meaning of the Act.  The Commonwealth also argues that Appellee lacks a reasonable expectation of privacy in his text message communications.  After careful review, we reverse the order granting suppression, and remand for further proceedings.

The trial court set forth the following factual summary:

---

[*] Retired Senior Judge assigned to the Superior Court.

Following an investigation of stolen guns involving Mr. Gary Still, Detective James Moyer of the Swatara Police Department went to Mr. Still's father's residence following Mr. Still's release from the hospital on February 21, 2013. Detective Moyer had determined that Mr. Still was involved in the theft of approximately twelve (12) firearms from the residence of 740 High Street. Detective Moyer advised Mr. Still of his Miranda rights. Mr. Still stated that he took numerous guns over a period of eight (8) weeks, and told the officers that he purchased heroin from [Appellee]. Mr. Still "traded" two of the guns he stole in exchange for heroin. Mr. Still indicated that these transactions with [Appellee] were set up on his iPad, which had been seized earlier by the police as part of the firearms investigation.

Detective Moyer testified that he asked Mr. Still if he would set up a heroin deal with [Appellee]. Mr. Still was told by the officers that it would be in his best interest to do so. Mr. Still agreed, telling the officers that he would use the text messaging service on his iPad. The transaction took place in the basement of the police station and was set up with Mr. Still communicating directly with [Appellee] on the iPad. Mr. Still relayed to the detectives each response from [Appellee]. In the room with Mr. Still were at least six (6) law enforcement officers. Detective Moyer testified that Officer Corey Dickerson was sitting next to Mr. Still during the communications and said that it was possible that the officer observed what Mr. Still was doing on the iPad. Specifically, a transaction was set up to take place at the Courtyard Marriot, and Mr. Still provided a description of [Appellee] and his car. When the time came for the deal, Mr. Still was on location with the officers and pointed out [Appellee]. [Appellee] was found to be in possession of multiple bundles of heroin and drug paraphernalia. [Appellee] sought suppression of these items, which was granted by this [c]ourt.

Suppression Court Opinion, 3/16/15, at 1-2.

Following a suppression hearing conducted on January 31 and February 20, 2014, during which the trial court heard testimony from Detective Moyer and Gary Still, the trial court requested that the parties brief the suppression-related issues. Both parties filed their memorandums

- 2 -

of law on April 4, 2014. Subsequently, on October 28, 2014, the court granted Appellant's suppression motion.

The Commonwealth filed a timely notice of appeal on November 21, 2014, and a court-ordered Pa.R.A.P. 1925(b) statement on December 5, 2014. The trial court issued its Rule 1925(a) opinion on March 16, 2015.

The Commonwealth now presents the following questions for our review:

[1]. Whether the trial court erred in granting Appellee's motion to suppress evidence because Appellee's te[x]t messages were not "intercepted" in violation of the Pennsylvania Wiretap Act?

[2]. Whether the trial court erred in granting Appellee's motion to suppress evidence because Appellee lacked a reasonable expectation of privacy in his text message communications?

[3]. Whether the trial court erred in granting Appellee's motion to suppress evidence because Appellee's iPad is not a "Device" as defined in the Pennsylvania Wiretap Act?

Commonwealth's Brief, at 4 (unnecessary capitalization omitted). For ease of disposition, we will address these issues in reverse order.

In reviewing the grant of a motion to suppress, we are guided by the following standard of review:

When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of facts bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

> ***Commonwealth v. Scott***, 916 A.2d 695, 696 (Pa. Super. 2007)
> (quotation omitted).  Further, the construction of a statute raises
> a question of law.  On questions of law, our standard of review is
> *de novo*, and our scope of review is plenary.  ***Commonwealth
> v. Bavusa***, 574 Pa. 620, 832 A.2d 1042, 1052 (2003).

***Commonwealth v. Deck***, 954 A.2d 603, 606 (Pa. Super. 2008).

The Commonwealth contends that Appellee's iPad is not a 'device' within the meaning of the Wiretap Act.  This is a matter of first impression.

The Wiretap Act prohibits, with certain exceptions, the interception of "any wire, electronic or oral communication[.]"  18  Pa.C.S.  §  5703(1)-(3).  "Intercept" is defined by the act as follows:

> **Aural or other acquisition of the contents of any wire,
> electronic or oral communication through the use of any
> electronic, mechanical or other device.**  The term shall
> include the point at which the contents of the communication are
> monitored by investigative or law enforcement officers.  The
> term shall not include the acquisition of the contents of a
> communication made through any electronic, mechanical or
> other device or telephone instrument to an investigative or law
> enforcement officer, or between a person and an investigative or
> law enforcement officer, where the investigative or law
> enforcement officer poses as an actual person who is the
> intended recipient of the communication, provided that the
> Attorney General, a deputy attorney general designated in
> writing by the Attorney General, a district attorney or an
> assistant district attorney designated in writing by a district
> attorney of the county wherein the investigative or law
> enforcement officer is to receive or make the communication has
> reviewed the facts and is satisfied that the communication
> involves suspected criminal activities and has given prior
> approval for the communication.

18 Pa.C.S. § 5702 (emphasis added).

The Wiretap Act also defines the intercepting "electronic, mechanical or other device" as:

> Any device or apparatus, including, but not limited to, an induction coil or a telecommunication identification interception device, that can be used to intercept a wire, electronic or oral communication other than:
>
> > (1) Any telephone or telegraph instrument, equipment or facility, or any component thereof, furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business, or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business, or being used by a communication common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties.
> >
> > (2) A hearing aid or similar device being used to correct subnormal hearing to not better than normal.
> >
> > (3) Equipment or devices used to conduct interceptions under section 5704(15) (relating to exceptions to prohibition of interception and disclosure of communications).

18 Pa.C.S. § 5702.

The Commonwealth argues that Appellee's iPad is not an intercepting "electronic, mechanical or other device" under the Wiretap Act because it was being used as the functional equivalent of a modern cellular phone, and telephones are explicitly excluded from the definition of what constitutes a "device" under the portion of Section 5702 cited immediately above. We disagree.

First, Appellee's iPad was not an "electronic, mechanical or other device" under Section 5702 because it was not used "to intercept a wire, electronic or oral communication." Indeed, there is not any evidence of record that Appellee used an iPad to communicate with Still. Moreover,

Appellee's text messaging device, whatever it was, was the origin of the intercepted message, and not the device that purportedly intercepted that message. Gary Still's iPad was purportedly used to intercept Appellee's electronic communication. Accordingly, the Commonwealth's claim that *Appellee's* iPad was not a "device" within the meaning of the Wiretap Act is simply not relevant to the merit of Appellee's suppression motion.

Nevertheless, the Commonwealth also argues that Still's iPad was not an "electronic, mechanical or other device" within the meaning of the Wiretap Act. In this regard, the Commonwealth again argues that an iPad was the functional equivalent of a telephone under the statutory definition set forth in Section 5702. The Commonwealth cites **Commonwealth v. Spence**, 91 A.3d 44 (Pa. 2014), in support of this claim.

In **Spence**, the question before our Supreme Court was whether a state trooper violated the Wiretap Act when he listened to Spence's conversation with an informant via the speaker on the informant's cellular telephone while the informant arranged a drug deal with Spence. The Commonwealth argued on appeal that because telephones were explicitly excluded under the definition of "electronic, mechanical, or other device[s]" in the Wiretap Act, the trooper had not violated the Act. Spence argued that the informant's phone was not a phone under the Act with respect to the trooper because the informant, and not the trooper, was a subscriber to the phone's communication services.

Our Supreme Court rejected Spence's argument, stating, "we see no basis upon which to categorize the arrestee's cell phone as a device with respect to him, but not as a device with respect to the Commonwealth." *Id.* at 47. The ***Spence*** Court also held that: "The language of the statute states that telephones are exempt from the definition of device; the language of the statute does not state that it is the use to which the telephone is being put which determines if it is considered a device." *Id.*

Here, in light of ***Spence***, the Commonwealth argues:

> In the instant case, Gary Still utilized the text message feature of his iPad to communicate directly with [Appellee], who utilized a cell phone. These text messages were sent utilizing a cell phone service, provided to Still in the ordinary course of business. Gary Still's iPad should be categorized as a telephone since it was being utilized as such in this case. In [Appellee]'s own suppression brief, the defense conceded that Still's iPad communications "should be treated the same as audible telephone calls."
>
> Therefore, because Gary Still's iPad is not a "device," there was no violation of the Pennsylvania Wiretap Act when Still texted with [Appellee] and relayed the responses to the surrounding officers.

Commonwealth's Brief, at 18.

We disagree with the Commonwealth's analysis. The ***Spence*** decision did not in any way broaden the telephone exception to the definition of what constitutes an "electronic, mechanical, or other device" under the Wiretap Act. An iPad is not a telephone or telegraph instrument under a common understanding of the relevant terms, and no reasonable person familiar with the now ubiquitous technology of tablet computers would misidentify an iPad

as a mere telephone. The fact that an iPad or any other tablet computer can perform functions similar or identical to a modern cellular phone is not dispositive, as the **Spence** Court's holding implies. The trend of convergence between modern computers and telephones aside, at this time the technologies in question remain different not only by degree, but also in kind.

Furthermore, the policy decision embodied in adopting such an expansive interpretation of the term 'telephone' under the Wiretap Act is beyond the province of this Court. Indeed, if we were to extend the Commonwealth's argument to its logical conclusions, any modern computer, in tablet form or otherwise, would have be considered a telephone under the Wiretap Act when it is used to transmit or receive an electronic communication. We decline to so radically expand the definition of 'telephone' under the Wiretap Act in this fashion without the benefit of further legislative input. Furthermore, it is, at best, a dubious proposition that the authors of the 1978 Wiretap Act intended "telephone" to include iPads, as the first tablet computers were not invented until the late 1980's.[1]

---

[1]**See** http://en.wikipedia.org/wiki/Tablet_computer#Early_devices, accessed on 6/1/15. Moreover, although the first tablet computers identifiable as such were invented in the late 1980's, **id.**, it would not be until 1994 that any mobile phone technology was used to transmit text messages on a broad scale. **See** http://en.wikipedia.org/wiki/Text_messaging#History, accessed on 6/1/15 ("Modern SMS [Short Messaging Service] text messaging is understood to be messaging from one mobile phone to another
*(Footnote Continued Next Page)*

Finally, our reluctance to expand the telephone exception is consistent with our policy to strictly construe the provisions of the Wiretap Act, as our Supreme Court explained in *Commonwealth v. Spangler*, 809 A.2d 234 (Pa. 2002):

> Pennsylvania's Wiretap Act emphasizes the protection of privacy, *see generally Commonwealth v. DeMarco*, 396 Pa.Super. 357, 371, 578 A.2d 942, 949 (1990), and, consistent with such emphasis, provides a statutory exclusionary rule that extends to non-constitutional violations. Because of this privacy concern, the provisions of the Wiretap Act are strictly construed. *See Boettger v. Miklich*, 534 Pa. 581, 586, 633 A.2d 1146, 1148 (1993).

*Spangler*, 809 A.2d at 237 (footnote and citation omitted).

For each and all of the aforementioned reasons, we conclude that an iPad is an "electronic, mechanical, or other device" that does not fall within the telephone exception under the Wiretap Act. As such, the Commonwealth's third claim lacks merit.

The Commonwealth next contends that Appellant lacked a reasonable expectation of privacy in the contents of the text message conversation he had with Gary Still. The Commonwealth asserts that *Commonwealth v. Proetto*, 771 A.2d 823 (Pa. Super. 2001), is instructive in this regard. We agree.

In *Proetto*, we recognized that:

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯

mobile phone. Radiolinja became the first network to offer commercial person-to-person SMS text messaging service in 1994.").

> While engaging in a conversation over the telephone, a party would have no reason to believe that the other party was taping the conversation. Any reasonably intelligent person, savvy enough to be using the Internet, however, would be aware of the fact that messages are received in a recorded format, by their very nature, and can be downloaded or printed by the party receiving the message. By the very act of sending a communication over the Internet, the party expressly consents to the recording of the message.

*Proetto*, 771 A.2d at 829. The *Proetto* Court further opined that:

> Sending an e-mail or chat-room communication is analogous to leaving a message on an answering machine. The sender knows that by the nature of sending the communication a record of the communication, including the substance of the communication, is made and can be downloaded, printed, saved, or, in some cases, if not deleted by the receiver, will remain on the receiver's system. Accordingly, by the act of forwarding an e-mail or communication via the Internet, the sender expressly consents by conduct to the recording of the message.

*Id.* at 830.

We find the reasoning of the *Proetto* Court equally applicable in this case. When Appellant engaged in a text message conversation with Gary Still, he knew, or should have known, that the conversation was recorded. By the very act of engaging in the means of communication at-issue, Appellee risked that Gary Still would share the contents of that conversation with a third party.

Appellee contends the instant case is not analogous to *Proetto* because *Proetto* involved conversations in an internet chat room and not text messages. He argues that when someone engages in chat room conversations:

- 10 -

> Neither the sender nor any of the multiple recipients of a communication posted on an internet chat room have the technological capability to delete that message once it is posted. In that situation, the proverbial bell cannot be unrung.
>
> However, the recipient of a text message has the technological capability to delete that text message, though the sender might not. Further, in most circumstances, the recipient of a text message is a single individual, not an internet chat room potentially populated by boundless, anonymous individuals. These facts readily distinguish a text message from the internet chat room message in **Proetto** on which the Commonwealth hangs its hat.

Appellee's Brief, at 9-10.

Appellee's argument is unconvincing. First, the **Proetto** Court expressly included e-mails in its analysis, and e-mails share far more in common with text messages than they do with chat-room posts. E-mails, like text messages, can be deleted (or not) by the recipient. E-mails, like text messages, are likely to have as a recipient a single individual rather than a group. Moreover, the **Proetto** Court also relied on **Commonwealth v. DeMarco**, 578 A.2d 942 (Pa. Super. 1990), wherein this Court had held that answering machine tapes fall within the mutual consent provision of the Wiretap Act. The **DeMarco** Court explained:

> [W]e take judicial notice of the irrefutable fact that any reasonably intelligent person leaving a message on an ordinary answering machine would have to be aware of, and consented by conduct to, the recording of the message on the answering machine tape. Absent some special showing of unique attributes of a particular answering machine cloaking its identity as an answering machine (not suggested here), we cannot imagine how one could not know and intend that the message placed upon the answering machine tape be taped, and by the very act of leaving a message, expressly consent by conduct to the taping of that message.

*DeMarco*, 578 A.2d at 948.

Clearly, whether an answering machine's owner could delete the recorded message was not relevant to the *DeMarco* Court's analysis of the expectation of privacy held by the caller. Similarly, here, the differences between chat-rooms, e-mails, and text messages, regarding who retains or controls the 'ability to delete,' are simply irrelevant. It is the sender's knowledge that the communication will automatically be recorded, surmised from the very nature of the selected means of transmission, that is dispositive of the sender's lack of an expectation of privacy or, at least, the lack of any reasonable expectation of privacy.

Second, Appellee argues that he possessed a heightened expectation of privacy, pursuant to the United States Supreme Court's recent holding in *Riley v. California*, 134 S.Ct. 2473 (2014). We disagree, as Appellee misunderstands the import of *Riley*.

In *Riley*, the defendant's 'smartphone' was seized incident to his arrest for firearms offenses. The police searched the contents of the phone for evidence of gang-related activity without first obtaining a search warrant. The Supreme Court held that the warrantless search of the contents of Riley's phone was illegal even though it was permissibly seized incident to his arrest. In reaching this conclusion, the Supreme Court held, *inter alia*, that modern 'smartphones' are qualitatively different from other items typically seized during an arrest due to the privacy implications arising from the cornucopia of information that can be contained in, or immediately

accessed from, such devices. Summarizing its holding, the Supreme Court explained:

> Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans "the privacies of life[.]" The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought. Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant.

*Riley*, 134 S.Ct. at 2494-95 (citation omitted).

Here, Appellee's reliance on *Riley* is simply misplaced. The police did not obtain the contents of Appellee's text message conversation with Still by searching Appellee's phone incident to his arrest. Indeed, the police did not obtain a recording of that conversation from Appellee at all. Thus, the heightened expectation of privacy recognized in *Riley* is not applicable to this case.

For the aforementioned reasons, we agree with the Commonwealth that Appellant lacked a reasonable expectation of privacy in the text message conversation he had with Still. In this regard, we find the following analogy, provided by the *Proetto* Court, particularly useful in conceptualizing the basis for this conclusion:

> E-mail transmissions are not unlike other forms of modern communication.... For example, if a sender of first-class mail seals an envelope and addresses it to another person, the sender can reasonably expect the contents to remain private and free from the eyes of the police absent a search warrant founded upon probable cause. However, once the letter is received and opened, the destiny of the letter then lies in the control of the

- 13 -

> recipient of the letter, not the sender, absent some legal privilege.... Thus an e-mail message, like a letter, cannot be afforded a reasonable expectation of privacy once that message is received.
>
> [**United States v. Charbonneau**, 979 F.Supp. 1177, 1184 (S.D. Ohio 1997)] (quoting **United States v. Maxwell**, 45 M.J. 406, 417 (C.A.A.F. 1996)).

**Proetto**, 771 A.2d at 831. This reasoning applies with equal potency to the text messages at issue in this case. When an individual sends a text message, he or she should know that the recipient, and not the sender, controls the destiny of the content of that message once it is received.

However, our analysis is not at an end simply because we have concluded that Appellee lacked a reasonable expectation of privacy in the text messages received by Still. Evidence may be suppressed for violations of the Wiretap Act even if the interception does not violate a reasonable expectation of privacy. We explained this distinction in **Commonwealth v. Deck**, 954 A.2d 603 (Pa. Super. 2008).

> [T]he Commonwealth argues that the telephone conversation recording should not be suppressed because Deck had no reasonable expectation that his telephone conversation [with the victim] was private.
>
> …
>
> Based on the definitions in and language of the Wiretap Act, we disagree. Section 5702 clearly and explicitly differentiates between oral communications and wire communications, giving a distinct definition for each. 18 Pa.C.S.A. § 5702. Section 5702's definition of wire communication does not include an expectation of privacy on the part of the speaker, as does its definition of oral communication. **Id.** Section 5703 is written in the disjunctive, and protects "wire, electronic or oral communications" from interception,

- 14 -

disclosure or use. 18 Pa.C.S.A. § 5703 (emphasis added). *See In re Paulmier*, 594 Pa. 433, 937 A.2d 364, 372 (2007) (recognizing that the word "or" when used in a statute is disjunctive, used to connect alternative words or phrases). Section 5703 does not state that a wire communication must also be an oral communication to be protected. *Id.*

Moreover, we remain mindful of our Supreme Court's admonition in *Spangler* that the Wiretap Act is modeled on Title III and that the Wiretap Act may not grant less protection than that available under the federal statute. Accordingly, we observe that the language of the definitions of wire communication and oral communication in the Wiretap Act and those in Title III [of the Federal Omnibus Crime Control and Safe Streets Act of 1968] are virtually identical, and that the federal courts have held that telephone conversations are wire communications which, unlike oral communications, are *protected against interception without regard to the speaker's expectation of privacy*. *See, e.g., Briggs v. American Air Filter Co., Inc.*, 630 F.2d 414, 417 & n.4 (5th Cir. 1980).

In light of *Spangler* and the discussion above, we conclude that Section 5703 of the Wiretap Act prohibits the interception, disclosure or use of a telephone conversation as a wire communication under Section 5702, even if the telephone conversation is not also an oral communication under Section 5702. 18 Pa.C.S.A. §§ 5702, 5703. This, in turn, leads us to conclude that Section 5703 prohibited the interception, disclosure or use of the telephone conversation between [the victim] and Deck. *Id. Deck's expectation of privacy is irrelevant*.

*Deck*, 954 A.2d at 608-09 (footnote omitted) (emphasis added).

Because a reasonable expectation of privacy in an electronic communication is not required to seek relief under the Wiretap Act violations, Appellee's lack of a reasonable expectation of privacy in his text messages with Still does not, by itself, preclude application of the statutory exclusionary rule provided by the Act. Thus, we reach the Commonwealth's remaining claim, wherein the Commonwealth contends that suppression was

not warranted because no 'intercept' occurred within the meaning of the definition as set forth in Section 5702 of the Wiretap Act.

In claiming that no interception occurred in this case, the Commonwealth relies on **Commonwealth v. Cruttenden**, 58 A.3d 95 (Pa. 2012), and **Proetto**.  In **Proetto**, this Court held that when an officer posed as an underage female to communicate with a suspected sexual offender in a chat room on the internet, no violation of the Wiretap Act occurs because the officer was a direct party to the communication, and thus there has been no "interception" of a communication under the statutory definition.  As Section 5702 provides, "The term[,]" interception, "shall not include the acquisition of the contents of a communication made … to an investigative or law enforcement officer[.]"  The **Proetto** Court explained its decision that no intercept occurred as follows:

> In this case, Detective Morris was a direct party to the communications from Appellant.  There was no eavesdropping or wiretapping.  Detective Morris obtained the information because he was a party to the communication.  The fact that Detective Morris did not identify himself as a police officer is of no effect. **See Commonwealth v. DiSilvio**, 232 Pa.Super. 386, 335 A.2d 785 (1975).  The Wiretap[] Act is not intended to prevent a telephone user from misrepresenting his or her identity. **Id.** Appellant freely elected to talk to Detective Morris, regardless of whether he was informed of "Kelly15F"'s true identity.  Therefore the communications received by Detective Morris should not be suppressed on the grounds that the means of obtaining this information was in violation of the Act.

**Proetto**, 771 A.2d at 832 (2001).

Similarly, in **Cruttenden**, our Supreme Court held that no intercept occurs when a law enforcement officer "communicates directly with a suspect via cell phone text messages while pretending to be the suspect's accomplice[,]" because "an officer who directly communicates with another person by text-messaging is not eavesdropping or listening in on a conversation, but is himself engaging in the communication[.]" **Cruttenden**, 58 A.3d at 96. Stated another way, "[t]he applicability of the Act does not rest on whether the caller's presumption of the identity of the person answering the call is accurate." **Id.** at 100.

Here, the Commonwealth essentially claims that no interception occurred when the police monitored Still's communication with Appellant because there was "less police intrusion" in this case as compared to what had occurred in **Proetto** and **Cruttenden**. This particular argument lacks merit.

Neither **Proetto** nor **Cruttenden** supports the Commonwealth's position as argued. In both cases, the communication at issue was between a suspect/defendant and a law enforcement officer, a situation specifically excepted from the statutory definition of "intercept." The definition of "intercept" in Section 5702 specifically excludes "the acquisition of the contents of a communication made through any electronic, mechanical or other device or telephone instrument to an investigative or law enforcement officer, or between a person and an investigative or law enforcement officer, where the investigative or law enforcement officer poses as an actual person

who is the intended recipient of the communication[.]" 18 Pa.C.S. § 5702. Here, no law enforcement officer was a direct party to the communication and, therefore, the Section 5702 exception to the definition of "[i]ntercept" does not apply.

Moreover, the Commonwealth provides no support for the proposition that what is or is not an intercept under the Wiretap Act turns on the magnitude of the 'police intrusion.' No such language appears in the statute, nor does the Commonwealth direct our attention to any pertinent case law to that effect.

However, we do conclude that no intercept occurred in this case for a different reason. Gary Still, and not the police, spoke directly with Appellee by text message in the at-issue communication, and he did so voluntarily. Still was a party to the conversation, and therefore he could not be said to have intercepted it simply because he received it. That he subsequently relayed the contents of that conversation to the police does not render either his or the police's conduct an "interception" under the plain meaning of the Act.

Once an individual text message is received by the intended recipient, the communication has ended. Once the communication had ended, it is simply illogical to conclude that subsequent actions constitute intercepts within the meaning of the Wiretap Act. While it is true that, in most instances, the content of a text message conversation will be recorded by the recipient's device as it is received, that circumstance is innate or

inherent to the technology. It would be absurd to conclude that anytime an iPad or similar device records a text message conversation that a Wiretap Act violation occurs—for that is the equivalent of saying that everyone receiving a text message on such a device has committed a Wiretap Act violation.

If an intercept did not occur during the transmission of the message, or at least simultaneous to the receipt of the message, then we must logically conclude that no intercept occurred at all. Our conclusion in this regard is buttressed by the fact that the record does not support Appellee's assertion that the police were watching Still's iPad screen over his shoulder as the text messages were sent back and forth to Appellee.[2] If the police

_____

[2] Appellee contends that "[t]he police supervised and observed the text-message conversation between Still and his drug supplier as it was occurring on the iPad." Appellee's Brief, at 3. However, Appellee's citations to the record simply do not support that factual claim. First, the trial court does not definitively resolve this issue. During its recitation of the facts, the court states:

> The transaction took place in the basement of the police station and was set up with Mr. Still communicating directly with [Appellee] on the iPad. Mr. Still relayed to the detectives each response from [Appellee]. In the room with Mr. Still were at least six (6) law enforcement officers. Detective Moyer testified that Officer Corey Dickerson was sitting next to Mr. Still during the communications and said that it was possible that the officer observed what Mr. Still was doing on the iPad.

Suppression Court Opinion, 3/16/15, at 1-2. The mere possibility that Officer Dickerson had contemporaneously observed the conversation between Appellee and Still on Still's iPad does not demonstrate that he did observe it. It merely expresses Detective's Moyer's uncertainty about what

*(Footnote Continued Next Page)*

- 19 -

*(Footnote Continued)*

Officer Dickerson observed.  Officer Dickerson did not testify, and neither of the testifying witnesses at Appellee's suppression hearing could say for certain if any of the officers had directly observed the conversation as it happened.

Later in its opinion, the trial court describes the events differently, stating: "During the communication, officers were in the room contemporaneously observing and directing, but *not themselves* doing the communicating. …  The officers['] giving direction to Still, and watching over him, amounts to eavesdropping or listening in on the electronic message communication."  ***Id.*** at 5 (emphasis in original).  The court also noted that "it was [Still] who initiated the phone call at the direction of the officers; the clear intent was to intercept."  ***Id.*** at 5 n.1.

This portion of the trial court's opinion could be read to imply that the officers were observing and directing Still, but not directly observing the conversation between Still and Appellee.  However, to the extent that this suggests that an officer directly observed the text message conversation as it appeared on Still's iPad, that interpretation of the facts lacks sufficient support in the record.  First, the trial court does not cite to the portion of the record that would support that interpretation.  Second, Detective Moyer's testimony does not support that interpretation.  Describing what happened, Detective Moyer stated:

> We asked Mr. Still if he would be willing to set up a deal with his dealer that evening, which he agreed to do.  From that point, he said he usually contacts [Appellee] with an i[P]ad through a text messaging service on his i[P]ad.  He was provided his i[P]ad.  He then set up the deal.
>
> He asked what he should do.  I said, [j]ust do your deal the way you normally would.  He set it up.  ***He relayed to me what was going on.***  The deal was set up.

N.T., 1/13/14, at 7.

Later, Detective Moyers stated that Officer Dickerson was seated next to Still during the iPad conversation, and that Officer Dickerson "could have seen" the messages as a result of his position in relation to Still.

*(Footnote Continued Next Page)*

had observed the text message conversation over Appellee's shoulder as it occurred, a different legal question would be before this Court because it would then be plausible to argue that the police may have observed the content of the text messages before Still had received them. However, because that particular factual scenario is not before this Court at this time, we need not address it.

_(Footnote Continued)_ ————————————

Third, Gary Still's testimony does not support the claim that police observed the iPad as the messages were received. He testified as follows:

> Q. How do you communicate that to the officers? Are you telling them or showing them the text messages?
>
> A. I am saying maybe a mixture of both. I am really not 100 percent sure of exactly how it happened; if they were looking at it or just asking me what I said or what was being said.
>
> Q. Were there any officers right with you while you were sending the text messages?
>
> A. No. I can't say they were right on top of me. The room wasn't that big that people were getting lost in there. **So there were people around me, but I don't think anyone was actually looking right over my shoulder.**

N.T., 2/20/14, at 9 (emphasis added).

Given the testimony from Still and Officer Dickerson, the only witnesses who testified at Appellee's suppression hearing, we read the trial court's opinion as concluding that Still's iPad conversation was not being directly observed by the officers as it occurred. Instead, the trial court intended to imply that by directing Still's conversation with Appellee, and by having Still relay the content as the conversation occurred, that the police had effectively intercepted it. Therefore, we disagree with the trial court only in its legal conclusion that an intercept occurred in these circumstances.

In sum, we conclude that no Wiretap Act violation occurred and, therefore, that the trial court erred when it granted suppression on that basis. Furthermore, because Appellee lacked any reasonable expectation of privacy in his text messages after they were received on Still's iPad, there was no constitutional violation of Appellant's privacy rights.

Suppression order *reversed*. Case *remanded*. Jurisdiction *relinquished*.

Judge Strassburger joins this opinion.

Judge Jenkins concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/23/2015