**UNITED STATES of America, Plaintiff,**

v.

**Donald G. STEVENS, Defendant.**

No. A97–0121 CR (JKS).

United States District Court,
D. Alaska.

Dec. 8, 1998.

Steven E. Skrocki, Assistant United States Attorney, and Robert C. Bundy, United States Attorney, Anchorage, Alaska, for the United States of America.

William P. Bryson, Anchorage, Alaska, for defendant Donald G. Stevens.

## ORDER GRANTING DEPARTURE

SINGLETON, District Judge.

### INTRODUCTION

Donald G. Stevens ("Stevens") was charged in an indictment with one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B), a class D felony.[1] Stevens entered a plea of guilty without

---

1. 18 U.S.C. § 2252A provides in relevant part:
   (a) Any person who—
       (5) either—
       (B) knowingly possesses any ... computer disk, or any other material that contains 3 or more images of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by comput-

a plea agreement and proceeded to sentencing. The maximum penalty is five years imprisonment and a $250,000 fine. Stevens received a sentence of twelve months and one day incarceration, a $10,000 fine and three years of supervised release. This sentence resulted in part from this Court's granting one downward departure and denying two others. *See* U.S.S.G. § 5K2.0. Because the parties agreed on the offense level and criminal history calculations made by the presentence officer, the only issues argued at the sentencing hearings concerned these possible downward departures. The Court set out its reasoning on the record and elaborates upon that reasoning in this written decision.

## THE OFFENSE

On September 26, 1997, Stevens took his laptop computer to John Martinson who operates a computer repair business. Stevens had been having difficulty with his computer's "mouse pad," which Martinson repaired. Martinson apparently performs an additional service for his customers, whether requested or not, whereby he searches the computers left in his care for computer viruses. The test Martinson performs requires him to review files kept on the computer's hard drive. During his inspection, Martinson found what he suspected were image files containing child pornography. Martinson was concerned that there were over four-hundred such images. Martinson initially copied these files to his hard disk but on advice of the police, he transferred the files to a zip disk and destroyed the images on his own hard drive. In the meantime, Martinson sabotaged Stevens' computer to prevent him from erasing the images. Martinson initially contacted the Anchorage Police Department and the case was eventually assigned to the Federal Bureau of Investigation.

The FBI obtained a search warrant for Stevens' computer and was able to access the files previously discovered by Martinson. Many of the files depict pre-teenage children. Most would qualify as obscene under the more stringent standards differentiating obscenity from child pornography. There are images of very young children engaging in bestiality and various sadomasochistic activities in apparent distress.[2] The conduct depicted could cause severe physical pain to the youthful participants. Experience teaches that the risk of psychological and emotional injury is even greater. The FBI found no additional evidence of child pornography in Stevens' residence except the computer images on his hard drive.

All of the images were obtained through "chat rooms" on America Online ("AOL"), to which Stevens subscribed. Stevens apparently became interested in the scope of material available through the chat rooms and took the time to learn the necessary codes and passwords to access those chat rooms specializing in child pornography. Stevens' modus operandi was to enter the chat room and transmit the single message "list me" in answer to code messages posted in the chat rooms. Other participants having pornography to distribute would read this message and in response, Stevens' "screen name" would be added to a mailing list and he would receive bulk e-mails of images, many of which would qualify as child pornography from other participants in the chat rooms.[3]

---

er, shall be punished as provided in subsection (b).

18 U.S.C. § 2252A(b) provides in part:
(2) Whoever violates, or attempts or conspires to violate, subsection (a)(5) shall be fined under this title or imprisoned not more than 5 years, or both, [with enhanced penalties for subsequent convictions].

**2.** As troublesome as these images are, it should be said in fairness to Stevens that the sadomasochistic images account for about ten percent of the three-hundred and fifty plus images he retained. The images of bestiality would increase that percentage slightly. The majority of the pictures depict nude or partially nude children

emphasizing their genitals. There are numerous images of adults engaging in sexual activity with very young children. There are also images of teenagers and possibly of youthful appearing adults.

**3.** "A screen name is an alias used by subscribers to computer services. The use of a screen name is commonplace, and is not limited to those engaged in illicit activities." *United States v. Lamb*, 945 F.Supp. 441, 446 n. 1 (N.D.N.Y.1996) (citations omitted). The operation of AOL is discussed in detail in *United States v. Maxwell*, 45 M.J. 406 (U.S. Armed Forces 1996). A detailed explanation of how AOL chat rooms operate and

It does not appear that Stevens ever actively participated in the activities of the chat room by soliciting particular images or discussing his collection with other participants.

Martinson feared that certain of the images might have been recently scanned locally and that Stevens might have appeared in some of the pictures, suggesting that Stevens was currently abusing children. No such evidence has been produced. The Court finds credible the testimony of Supervisory Special Agent Kenneth V. Lanning of the FBI that it is difficult to date any particular image without a context. Lanning estimated that the bulk of the images currently in circulation were produced and placed in circulation in the late 1960s and early 1970s, continuing into the 1980s and even the 1990s.

Pornographic images, including images involving children, have been in existence since the invention of the camera in the 19th century. This is clear from the reports of the two Commissions which have addressed obscenity and pornography. *See* THE REPORT OF THE COMMISSION ON OBSCENITY AND PORNOGRAPHY 136–43 (Bantam Books 1970) (reflecting the conclusions of the Commission established by President Johnson in 1967) (hereafter "Commission–70"); FINAL REPORT OF THE ATTORNEY GENERAL'S COMMISSION ON

PORNOGRAPHY 130–81, 341–84 (Rutledge Hill Press 1986) (reflecting the conclusions of the Commission appointed by President Reagan's Attorney General in 1985) (hereafter "Commission–86"). Anthony Comstock, the 19th century crusader against obscenity, bragged that he had personally destroyed over three-million pornographic pictures. *See* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 12–16 at 918 (2d ed.1988). The 1970 Commission on Obscenity and Pornography was unable to verify how many obscene pictures were in circulation, but estimated that there must be millions. *See* Commission–70 at 141. While both Comstock and the Commission on Obscenity and Pornography did not differentiate between child and adult pornographic pictures, or between drawings and photographs, there is no reason to believe that the volume of such pictures was significantly different based upon the age of the persons depicted. Bearing in mind that Matthew Brady was only one among many successful commercial photographers at the time of the American Civil War, it is reasonable to assume that millions of photographs depicting children in sexually charged situations were produced domestically or imported from abroad and were in circulation prior to 1977.[4]

how bulk e-mail lists for child pornography are established is given in *United States v. Charbonneau,* 979 F.Supp. 1177, 1179 (S.D.Ohio 1997).

4. Three somewhat overlapping trends might explain an increase in the number of images distributed between 1965 and 1975. First, the children's rights movement coming at the same time as the sexual revolution, and increased community acceptance of the youth culture, including youth drug use, tended to eliminate traditional restrictions on the freedom of young people and substantially increased the number of runaways (while at the same time the beginnings of the human potential movement and the urge to "do your own thing" cut down on parental responsibilities resulting in many "throw away kids") who lived on the street or with those who would take them in. Such children were therefore susceptible to all forms of exploitation including youth prostitution and the production of pornography. The undersigned was an Alaska Superior Court Judge with responsibility for the Family Court during a significant part of the period from 1970 to 1980. Matters within the jurisdiction of the Family Court included both domestic relations and children's proceedings. *See, e.g., L.A.M. v. State,* 547 P.2d 827 (Alaska 1976) (dis-

cussing the community response to a typical runaway during that period). *See also Rodriquez v. State,* 741 P.2d 1200, 1204–06 (Alaska App.1987) (testimony dealing with the same general time period and outlining how children on the street are recruited and exploited by child sexual abusers).

The second trend was a general slackening of community opposition to "hard core pornography," culminating in the Supreme Court's decision in *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), which held that people had a First Amendment right to possess pornography in their homes. Many critics believed that this decision foretold future decisions which would by analogy to the Supreme Court's birth control jurisprudence, legitimate the delivery and transmission of pornography as well. *See, e.g., Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). Thus it was widely believed that prosecution of those who distributed pornography to consenting adults would not be punished. *See* CHARLES REMBAR, THE END OF OBSCENITY *passim* (1968). The recommendations of the 1970 Commission on Obscenity and Pornography focus on

There was no evidence beyond Lanning's testimony regarding the origin of the specific images in question, and the Government made no effort to show that any of the images Stevens possessed were recently produced.[5] A preponderance of the evidence would therefore indicate that each of the images collected by Stevens originated and was probably produced prior to 1977, over eighteen years before Stevens first downloaded pornography in 1995.[6] Thus there is

1969 as the culmination of an increasing tolerance of what had been considered hard core pornography. *See* Commission–70 at 136–37. *See also* Commission–86 at 14, 341–84 (adopting essentially the same historical overview). This belief was relatively short-lived. The United States Supreme Court decided three cases in the early 1970s which upheld laws restricting the sale, importation and transportation of obscene materials to consenting adults. *See United States v. 12 200–Foot Reels*, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); *United States v. Orito*, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973); *United States v. Reidel*, 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971). Shortly thereafter, Congress enacted the Protection of Children Against Sexual Exploitation Act of 1977, 18 U.S.C. § 2251 *et seq.* The history of this Act and its various amendments are discussed in *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994). Writing in 1990, both the majority opinion written by Justice White and the dissent by Justice Brennan assumed that the enactment by Congress of the 1977 Act and comparable acts in the states had effectively driven the child pornography market underground and by inference returned it to the cottage industry status it had before 1969. *See Osborne v. Ohio*, 495 U.S. 103, 110–11, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (majority opinion). *Accord id.* at 143–45 nn. 17 & 18, 110 S.Ct. 1691 (Brennan, J. dissenting).

The final consideration is the advances in photographic technology in the late 1950s, which simplified the reproduction of pornographic images and increased their distribution. It is interesting that the 1970 Commission on Obscenity and Pornography found that these technological advances had significantly reduced the commercial traffic in pornographic pictures because of "the ease and inexpensiveness with which photographs can be duplicated or produced by self-developing cameras." *See* Commission–70 at 141. It is reasonable to assume that the utilization of computers which increases the ease and decreases the cost of duplication has enhanced this trend to increase distribution at the same time that commercial distribution is further curtailed. *See Lamb*, 945 F.Supp. at 450 (explaining how pornographic photographs are "scanned" and thereby transferred to a computer where they can be copied as often as the pornographer wishes).

In summary, this Court concludes that given the substantial number of images of child pornography in existence in the early 1970s, the significant effect of laws punishing the production, distribution and reception of child pornography beginning in 1977, and the relative ease with which existing images can be duplicated and transmitted, it is reasonable to infer that any given image downloaded from a computer and possessed in 1995 originated prior to 1977 in the absence of some indication that a particular image is of more recent vintage.

5. Lanning testified that it was virtually impossible to tell the age or origin of any specific image except by reference to circumstantial evidence (i.e., hairstyles, furniture, etc.). He did note that over the years law enforcement has prosecuted many producers of child pornography, and that law enforcement agencies provide a clearinghouse regarding such prosecutions. Frequently, law enforcement officers can recognize specific images as originating with specific producers tracing the images in that way and providing a rough date. Also, various state and federal law enforcement agencies are constantly monitoring computer chat rooms and "billboards." When a producer is caught in a "sting" it is sometimes possible to trace certain contemporaneous pictures to the producer's computer-correspondents. That was not done in this case. A major investigation of AOL users entitled "innocent images" is detailed by the district court in *Lamb*, 945 F.Supp. at 445–46. It is also clear from a review of the cases that many chat room conversations involve images that are being represented as recently produced and purport to represent current children. The chat rooms that Stevens frequented were monitored by federal law enforcement agents and his screen name was noted. The Government has submitted logs of what are apparently intended to serve as representative samples of such conversations. There is no evidence that Stevens responded to a discussion indicating that photographs of children currently being abused were available.

6. This is not to say that new images have not been added to the total number of pictures in circulation since 1977. Clearly they have been. *See, e.g., Qualle v. State*, 652 P.2d 481 (Alaska App.1982) (Qualle was photographing pre-school children in sexual poses and sending the photographs to Scandinavian pornographic magazines in 1979. His crimes were discovered when German custom agents confiscated the film). Many of the federal cases involve people who are currently abusing children and photographically recording that abuse. The point is that current production is part of a cottage industry in which abusers photograph the abuse and in some cases distribute the resulting images. *See* Commission–86 at 130–38. When we remember that much of this current activity involves photo-

no evidence that any of the images depict individuals who were under the age of eighteen at the time Stevens downloaded their image.

It is clear, however, that a substantial number of the images collected by Stevens portray children substantially under the age of eighteen at the time the images were produced. There is no evidence that Stevens participated personally in any of the activities depicted. There is no evidence that Stevens attempted to contact any person depicted in any of the images, or ever learned or attempted to learn the identity of any such person. Furthermore, there is no evidence that Stevens corresponded with anyone representing that he or she was currently producing child pornography or currently abusing children.

## THE OFFENDER

Stevens was born in West Stewartstown, New Hampshire, on February 25, 1951. He was forty-seven years old at the time of sentencing. He has no criminal record. Stevens has never been married and has no children. He is currently living with Suzanne Eusden, whom he met at a mountaineering club meeting in New Hampshire twenty-seven years ago. They have lived together for eight years. At sentencing it was mentioned that Stevens had previous short term relationships lasting up to a year with other women, but the details are sketchy. It does not appear that Stevens ever sought out women with children for relationships. In fact, Stevens indicates that he does not wish to be married and have children because it would interfere with his freedom.

Stevens graduated from high school and attended college for two years earning an Associate of Science degree in Forestry.

Most recently, Stevens has worked steadily as a longshoreman in Whittier, Alaska. He also has a part time business caring for privately owned boats in Whittier. Stevens has invested successfully in the stock market and has a net worth of over $350,000. He purchased his computer in 1995 in part to monitor his stock holdings. It does not appear that Stevens owned a computer prior to 1995.

## THE SENTENCE

The Court held two sentencing hearings in this case. The first hearing was held on July 31, 1998. At that hearing, Dr. James F. Harper testified on behalf of Stevens, but the hearing ended before he could be cross-examined. The Court also heard from Ms. Eusden and from George Kapolchok, a friend of Stevens.

At the second hearing, held on September 29, 1998, Dr. Harper completed his testimony. The Government then presented its witnesses. Doctor Irvin A. Rothrock testified in person, and the Court heard telephonic testimony from Dr. Andres E. Hernandez, Director of the Sex Offender Treatment Program at the Federal Correctional facility in Buckner, North Carolina, and national coordinator of sex offender treatment for the Federal Bureau of Prisons. The Court also heard from Kenneth V. Lanning of the FBI, who has served for over eighteen years as an investigator and consultant on issues of child sexual exploitation. The Court additionally heard allocution from Stevens and argument from counsel for both parties.

The Court adopted the factual findings and Sentencing Guideline application in the presentence report, supplemented by certain factual findings made during the evidentiary hearings. Stevens had a Total Offense Level of 16, and a Criminal History Category of I.[7]

---

graphing for private consumption as a souvenir of abuse and not distribution, it becomes clear that as a percentage of the total images in circulation, any images added since 1977 would constitute a small proportion of the overall circulation. It is certainly possible that some of the images possessed by Stevens might have been produced more recently, but Stevens' burden to prove facts in support of a downward departure does not require him to prove a fact beyond reasonable doubt much less beyond all possible

doubt. His burden is to prove a fact by a preponderance of the evidence. *See United States v. Lipman*, 133 F.3d 726, 729 (9th Cir.1998). In the absence of evidence to the contrary regarding a specific child pornographic image, it is more probable than not that the image was produced prior to 1977.

7. The applicable Sentencing Guideline is U.S.S.G. § 2G2.4. The Base Offense Level is 15, see U.S.S.G. § 2G2.4(a), two levels were added

Stevens was therefore subject to a sentencing range of twenty-one to twenty-seven months and two to three years of supervised release, a fine of from $5,000 to $50,000, and a special assessment of $100. Ultimately, this Court determined to depart downward three offense levels to a Total Offense Level of 13 in reliance on U.S.S.G. § 5K2.0, placing Stevens in a sentencing range of twelve to eighteen months.

The Court sentenced Stevens to twelve months plus one day to assure him credit for good time served, three years of supervised release, a fine of $10,000 and a special assessment of $100. *See* Docket No. 44 (Judgment). These remarks will expand slightly on this Court's oral discussion of the factors that influenced its decision and hopefully put this case in context. The issues are sufficiently complicated that a more detailed written decision should provide illumination.

### WORST, TYPICAL AND LEAST OFFENDERS

There was no plea agreement in this case. The parties accepted the conclusions of the presentence report regarding the applicable Sentencing Guideline range. The Government did not suggest any aggravating factors beyond the number of pornographic images and their content. Stevens, however, asked for a downward departure.

The United States Supreme Court has provided guidance to the district courts regarding their discretion to grant departures. *See Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). *See also United States v. Sanchez–Rodriguez*, 161 F.3d 556 (9th Cir.1998) (en banc). Essentially, sentencing courts should proceed in stages. The first stage involves identifying the "heartland" of the applicable Sentencing Guideline. *See Koon*, 518 U.S. at 95, 116 S.Ct. 2035 (citing *United States v. Rivera*, 994 F.2d 942, 949 (1st Cir.1993)). While the Supreme Court uses slightly different terminology, it looks for the same factors that have historically guided sentencing. The trial judge must imagine the universe of those convicted of a given offense and then divide that universe into three subsets: worst offenders, typical offenders, and least offenders. Presumably the worst offenders will receive a sentence near the top of the range of available sentences, a typical offender—one occupying the heartland—will receive a sentence in the middle, and a least offender will receive a sentence near the bottom of the available sentences. The worst and least offenders are defined by reference to the typical offender who with his typical offense occupies the heartland.[8]

■■■ A district court considering a departure must before considering the specific arguments advanced by the parties, define the heartland of the Sentencing Guideline which accounts for the typical case, and then—after a careful consideration of the applicable Guidelines—identify and examine factors which serve to distinguish the defendant being sentenced from the typical defendant in the typical case. Once these factors have been segregated, the court can then determine whether any of the factors alone or in combination serve to remove the case sub judice from the heartland and warrant a

---

because some of the computer images depicted pre-teens, *see id.* § 2G2.4(b)(1), and two levels were added because Stevens obtained the images over the internet with his computer, *see id.* § 2G2.1(b)(3). Therefore, Stevens' Adjusted Offense Level was 19. This was reduced by three levels to reflect acceptance of responsibility, *see id.* § 3E1.1(b), leaving a Total Offense Level of 16.

8. *Koon* constituted a sharp break with the approach previously taken in the Ninth Circuit regarding departures. In prior case law, the Ninth Circuit viewed trial court discretion regarding departures as limited to suggesting proposed bright line rules to the circuit court which if adopted became standards for future operation.

The circuit thus took a categorical approach to departures. Some trial court suggestions were adopted either on the nomination of the trial court or by the panel on appeal and these became in effect judicial amendments to the Sentencing Guidelines. Other proposals were categorically rejected. *Koon* precludes categorical rejection of a proposed departure unless the Sentencing Guidelines themselves specifically preclude it and teaches that each case must be decided on its individual merits without the need to develop any bright line rules beyond those specific factors which the Guidelines themselves reject as appropriate sentencing considerations. *See United States v. Sanchez–Rodriguez*, No. 97–10238, 1998 WL 801855 (9th Cir. Nov.20, 1998) (en banc).

departure either upward or downward. To make this decision, the court must determine whether the factor(s) that are relied upon to take a case out of the heartland are encouraged, discouraged or neutral in the treatment given to the offense by the United States Sentencing Commission. This case is complicated by the fact that the heartland of the offense and of the offenders who commit it has not been well defined.[9]

The offense at issue in this case constitutes one of a number of offenses that might best be characterized as child sexual exploitation. *See* 18 U.S.C. §§ 2251–60. There is some similarity between these offenses and the sexual abuse of children. *See* 18 U.S.C. §§ 2241–48. While serving first as an Alaska Superior Court Judge, and later as a judge of the Alaska Court of Appeals, an appellate court whose jurisdiction was limited to criminal cases and related matters including sentence appeals, the undersigned gained extensive exposure to the prosecution of those who abuse children sexually and the sentences they receive. *See* AS 22.07.010–.100 (establishing Alaska Court of Appeals and defining its jurisdiction, composition and parameters).

Alaska followed England in providing by statute for appellate review of sentences in 1969. *See* AS 12.55.120 (1969); *State v. Chaney*, 477 P.2d 441 (Alaska 1970).[10] The Alaska Court of Appeals inherited that jurisdiction when it was established in 1980. The general criteria for sentence review was prescribed in *Chaney*. A sentence should serve the overlapping goals of rehabilitating the offender into a non-criminal member of society, isolating the offender from society to prevent criminal behavior during the period of rehabilitation, deterring the offender himself after his release from confinement or other penalogical treatment, as well as deterring other members of the community who might possess similar tendencies toward criminal conduct, and community condemnation of the individual offender, or in other words, reaffirming societal norms for the purpose of maintaining respect for the norms themselves. *See Chaney*, 477 P.2d at 444 (citing *Appellate Review of Primary Sentencing Decisions: A Connecticut Case Study*, 69 YALE L.J. 1454 (1960)). With the addition of retribution, which appears in the Yale Law Review article but not in the *Chaney* list, these factors are virtually identical to the factors described in 18 U.S.C. §§ 3582 and 3553(a).[11]

9.  The offense is defined by its elements. Anyone whose conduct provides an evidentiary basis for conviction and either pleads guilty or is convicted at trial is properly placed in the population or set of offenders. The Government seems to argue that this population is co-extensive with the heartland, but the Government's argument is clearly not plausible. The three groups, worst offenders, heartland (i.e., typical) offenders, and least offenders, all encompass individuals who have committed the crime and satisfied its elements. Anyone who did not satisfy the elements would be entitled to a judgment of acquittal and would not be in the total population awaiting sentencing. Thus, the difficulty does not lie in determining whether a given defendant is guilty, for that information is supplied by the defendant's plea or a jury verdict. Rather, the difficulty lies in determining what type of an offender the guilty person is in the perception of Congress and the Sentencing Commission.

10. In *Chaney*, the Alaska Supreme Court discussed at length the 1968 approved draft of the ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Appellate Review of Sentences. *See* 477 P.2d at 443–47. That draft notes the English practice of permitting appellate review of sentences, a practice not

common in the United States at that time. The English practice is more thoroughly discussed in Sir Rupert Cross's *The English Sentencing System* (London: Butterworths 1975).

11. Section 3553(a) adopts a principal of "leniency" whereby a sentence should be sufficient but not greater than necessary to comply with the purposes set forth in paragraph 2 of the same subsection. Those purposes are (1) just punishment or retribution and promotion of respect for the law, which the *Chaney* court called community condemnation or reaffirmation of community norms; (2) adequate deterrence from criminal conduct, presumably both special deterrence aimed at the sentenced prisoner himself and general deterrence aimed at those in the class of potential violators of the same statute; (3) protection of the public, which could be redundant of deterrence but in context probably means by isolation, which in other discussions is called incapacitation; and (4) rehabilitation. *See* 18 U.S.C. § 3553(a)(2). Like the *Chaney* court, the federal statute suggests that application of the factors should take into account "the nature and circumstances of the offense and the history and characteristics of the defendant." *See id.* § 3553(a)(1). These sentencing factors can be traced back at least to Plato's laws. *See, e.g.,*

Alaskan judges were sentencing with regard to these factors and subject to appellate review over fifteen years before sentencing appeals were authorized in the federal system. In presumptive sentencing, Alaska judges had a preview of what federal judges would encounter in the Sentencing Guidelines.

Prosecution of sexual abusers significantly increased in Alaska in the 1970s and a significant percentage of the sentence appeals before the Alaska Court of Appeals involved sexual abuse of minors. *See* AS 11.41.434–.470 (sexual abuse of minors in various degrees). In part this was traceable to the fact that Alaska adopted a revised criminal code based on the Model Penal Code and a new presumptive sentencing system based on proposals by the Twentieth Century Fund Task Force on Criminal Sentencing. *See* REPORT OF THE TWENTIETH CENTURY FUND TASK FORCE ON CRIMINAL SENTENCING, FAIR AND CERTAIN PUNISHMENT (1976); *Braaten v. State*, 705 P.2d 1311, 1323–28 (Alaska App. 1985) (Singleton, J., concurring). Many of the sexual abuse cases the undersigned considered while sitting on the Alaska Court of Appeals involved child pornography. *See, e.g., Lawrence v. State*, 764 P.2d 318 (Alaska App.1988); *Rodriquez v. State*, 741 P.2d 1200 (Alaska App.1987); *Dymenstein v. State*, 720 P.2d 42 (Alaska App.1986); *Qualle v. State*, 652 P.2d 481 (Alaska App.1982). The only case that involved only child pornography without accompanying sexual abuse appears to have been *Harris v. State*, 790 P.2d 1379 (Alaska App.1990), where a stepfather photographed his stepdaughter for his own arousal with no evidence of distribution.

■ Nevertheless, the weight of the evidence presented at the sentencing hearing in this case suggests that persons convicted of the offenses for which Stevens was convicted should not, in the absence of more evidence, be automatically confused with men and women convicted of sexually abusing children. While some child molesters view pornography and some do not, and some who view pornography molest children but most do not, there seems to be no significant correlation between the two groups. Dr. Hernandez, Director of the Sex Offender Treatment Program, presented testimony to this Court in which he essentially treated the two groups as fungible. However, Dr. Hernandez's opinion was formed based upon his dealing primarily with the class of child molesters. The Court concludes that this limited experience may have distorted Dr. Hernandez's views.[12]

The weight of the evidence suggests that men and women who have more than a passing interest in child pornography, certainly those who would collect large volumes of it, fall into a deviant subclass of the community (i.e., most men and women do not do this or have any interest in doing it). Men and women in deviant groups typically come to the attention of social scientists in one of two ways. Either their deviancy constitutes a crime and brings them to the attention of the police, or their deviancy conflicts with other aspects of their lives (e.g., difficulty earning a living) and leads the person to seek mental health counseling.[13] Where a deviant has adjusted to his deviancy, he will not wish to change it, and will therefore not seek mental health treatment, and if the deviancy does not involve living victims who are capable of making a complaint, the deviancy is unlikely to come to the attention of the authorities. In such cases, neither the law enforcement community nor the mental health community

PLATO, THE LAWS 256 (Thomas L. Pangle trans., Basic Books, Inc.1980); MARY MARGARET MACKENZIE, PLATO ON PUNISHMENT (1981). Since Plato, each of the factors has received much attention in the literature. *See, e.g.,* PHILOSOPHICAL PERSPECTIVES ON PUNISHMENT (Gertrude Ezorsky ed., State Univ. of New York Press 1972); A READER ON PUNISHMENT (Antony Duff & David Garland eds., Oxford Univ. Press 1994).

**12.** It is unfortunate for purposes of defining a heartland of offenders in this case that the two groups are not fungible because most judges, at least those with state court experience, have had extensive experience with child molesters in the criminal justice system at least since the late 1970s. Understandably, most courts do not have much experience to rely upon in defining a class of offenders who possess pornography but do not also sexually molest children.

**13.** The number of men and women from deviant communities who publish their memoirs, while increasing in recent years, hardly provides a sufficient sample to permit meaningful statistical analysis.

will generate informed statistics regarding the composition of the deviant community which might allow for meaningful study of the community's characteristics.

It seems, therefore, that where a person must be sentenced for an offense that is not frequently prosecuted and where there is no opportunity to rely on social science literature to characterize the heartland of offenders, a court must approach the issue indirectly for purposes of distinguishing between heartland, or typical offenders, on the one hand, and worst or least offenders on the other. The terms "worst offender" and "least offender" could refer to the nature of the offender or the nature of the offense, or a combination of both. *See Harris,* 790 P.2d at 1382–84. Thus, a worst offender could be either a multiple offender with a history of convictions who has not learned from past periods of incarceration, or a man or woman who commits a single particularly egregious offense, for example, a person who pleads to a lesser offense while having committed a greater offense. Under the Sentencing Guidelines, a person's criminal history addresses his past behavior. Thus the primary focus in this decision will be on the gravity of Stevens' offense. In this Court's view, it has always seemed most reasonable to view worst offenders as people whose relevant conduct encompasses a more serious offense than the one to which the offenders plead as basically the beneficiaries of charge bargaining. *See Braaten,* 705 P.2d at 1323–28 (Singleton, J., concurring) (discussing worst and least offenders). In contrast, a least offender would be one who minimally qualified as an offender under the relevant statute. *See id.* at 1325.

This approach seems particularly appropriate taking into consideration the fact that nearly ninety percent of criminal prosecutions result in a plea, generally pursuant to a plea agreement. *See* U.S.S.G. Ch. 1, Pt. A, Intro. 4(c) (1997). Plea agreements fall into roughly two categories, sentencing bargains where the parties bargain for a particular sentence or range of sentences, and charge bargains where the parties agree on the charge that will be sustained by the plea and further agree that other charges that could have been brought will not be brought and additional charges that were brought will be dismissed. The Sentencing Guidelines have significantly restricted sentence bargaining. Thus, the bulk of the plea agreements seen in this Court have been charge bargains where people arguably guilty of greater offenses or multiple offenses save the Government the time and trouble of going to trial in return for permission to plead to one or more "lesser" offenses.

It is possible that Stevens was only guilty of and therefore plead to the lowest possible charge, eliminating any room for a charge bargain. Nevertheless, failure to recognize the significance of charge bargaining in creating the class of offenders convicted of any specific offense distorts any effort to visualize the heartland for any Guideline relevant to that offense. This is because the typical person being sentenced for an offense will probably have entered into a charge bargain and his or her relevant conduct will typically show guilt of more serious conduct than a limited examination of the elements of the offense named in the charge bargain would disclose. *See, e.g., United States v. Romualdi,* 101 F.3d 971 (3rd Cir.1996) (defendant guilty of receiving plead to possession); *United States v. Wind,* 128 F.3d 1276 (8th Cir.1997) (defendant guilty of transmitting computer images of child pornography to an undercover agent of the police plead to simple possession).[14]

---

14. This is not to say that Stevens' plea to the charged offense did not result in some benefits to him. He received credit for acceptance of responsibility despite his limited acknowledgment of responsibility. In addition, the Government did not argue and the pre-sentence officer did not recommend that Stevens be assessed a two level increase in his offense level for ten or more visual depictions. *See* U.S.S.G. § 2G2.4(b)(2). Each computer file constitutes a separate visual depiction and Stevens had more than three-hun-

dred images suggesting substantially more than ten files. *See United States v. Fellows,* 157 F.3d 1197, 1200–02 (9th Cir.1998). Finally, it is possible that a jury would have convicted Stevens of "receiving" the images via his computer and not merely possessing them. If so, he would have been vulnerable to an initial two offense level increase pursuant to U.S.S.G. § 2G2.2, and a four level upward adjustment because a number of the images he collected depicted sadistic or masochistic conduct. *See* U.S.S.G.

With this in mind, in the absence of any significant experience with a particular offense and class of offenders, the best approach is to look at the evils which the statute is intended to prevent and see how a particular offender's conduct compares to the evils Congress sought to prevent. Viewed in this light, someone whose conduct seriously contributed to the harm identified by Congress—particularly where his relevant conduct included commission of a greater offense—would be a worst offender, who in an appropriate case could receive an upward departure, someone who significantly contributed to the harm but less seriously would occupy the heartland, and someone who was properly convicted because his conduct satisfied each of the elements of the offense but whose conduct minimally contributed to the harm envisioned by Congress would be a least offender eligible for a downward departure.

Fortunately, in three separate decisions, the Supreme Court has provided significant guidance on what harms follow from the possession of child pornography. *See Osborne v. Ohio,* 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990); *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); *Stanley v.. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). None of these cases specifically address the federal statutes being considered in this case, but subsequent cases which do address those statutes and the legislative history surrounding enactment of the federal statutes make it clear that Congress was concerned about the same harms and the same victims. *See United States v. Boos,* 127 F.3d 1207, 1211–13 (9th Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 734, 139 L.Ed.2d 672 (1998).

In *Stanley,* the Supreme Court held that the First Amendment protected the private possession of obscene material whose production could be prohibited under the test that was established in *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), and subsequent to *Stanley,* modified in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). In *Ferber,* the Supreme Court held that the *Miller* test did not limit a state's authority to bar sexually provocative depictions of children even if those depictions were not strictly speaking obscene. Finally, in *Osborne,* the Supreme Court declined to apply *Stanley* to child pornography, concluding that the state's interest underlying prohibition of child pornography far exceeded its interest in prohibiting adult pornography and justified penalizing private possession in the home. *See* 495 U.S. at 108–09, 110 S.Ct. 1691.

*Ferber* made a sharp break with *Stanley* in terms of its analysis of the social harms traceable to pornography. *Stanley* represented the historic view toward laws prohibiting the possession of pornography which rested on the assumption that the only social harms flowing from the production and distribution of pornography were to the consumer who would be corrupted by viewing the images. This was also the thrust of the analysis provided by the 1970 Commission on Obscenity and Pornography. While the Commission on Obscenity and Pornography did discuss harms to children, those harms emanated from possessing or receiving pornography, not from participating in its production. *See* Commission–70 at 62–67, 412–13. *Ferber* looked not to the harm which consumers suffered, but to the harm participants suffered in producing the pornography. *Osborne* followed *Ferber* in this regard. The danger that the minds of those possessing the material would be "poisoned" was insufficient to permit regulation of private possession in the home under *Stanley,* but the real danger in the form of harm to the physiological, emotional and mental health of the exploited and potentially exploited children portrayed in the pornography provided sufficient justification in the view of the *Osborne* majority for the prohibition on private consumption of child pornography by consenting

---

§ 2G2.2(b)(3). Had he been charged with receiving and not merely possessing, he could have been charged separately for each "file" and the offenses would not have been grouped which would have resulted in a potentially much higher sentence. *See, e.g.,* U.S.S .G. §§ 3D1.4–.5 (suggesting that someone possessing over three-hundred and fifty images could have his offense level increased as much a five levels). *See also United States v. Boos,* 127 F.3d 1207, 1213 (9th Cir. 1997), *cert. denied,* — U.S. —, 118 S.Ct. 734, 139 L.Ed.2d 672 (1998).

adults. *See Osborne,* 495 U.S. at 109, 110 S.Ct. 1691. *But see id.* at 139–45, 110 S.Ct. 1691 (Brennan, J., dissenting).

*Osborne* pointed to three essential harms to children addressed by the laws prohibiting private possession of child pornography: (1) reception and possession of child pornography encouraged its production; (2) child pornography could be used by pedophiles to seduce their victims; and (3) pornographic materials constituted a permanent record of a child's abuse which could haunt the child in years to come. *See id.* at 108–11, 110 S.Ct. 1691. Prohibiting possession encourages possessors to destroy their inventory, thus providing some solace to past victims. *See id.* at 111, 110 S.Ct. 1691. *See also United States v. Arvin,* 900 F.2d 1385, 1387 (9th Cir.1990), *cert. denied.,* 498 U.S. 1024, 111 S.Ct. 672, 112 L.Ed.2d 664 (1991). Thus, the gravamen of the offense is the harm to the real children exploited in the pornographic depictions. *See Boos,* 127 F.3d at 1209–13.[15] Knowledge of the harms to be prevented and the victims to be protected helps a trial court identify the heartland of the offense and divide offenders into the three classes of offenders based upon the extent to which each offender's conduct contributes to the harm and injures the victims identified by Congress.

First we must ask if Stevens is among the class of worst offenders. Clearly, if Stevens' conduct warranted an upward departure on the basis that he was a worst offender, it would be difficult to conclude that he was also entitled to a downward departure on the ground that he was a least offender. A worst offender would generally be an offender whose relevant conduct constituted a greater offense or whose conduct substantially contributed to the harms identified by Congress in enacting the statutes in question.

There is no evidence that Stevens ever abused a specific child, or that he singled children out for specific attention whether permissible or impermissible. Stevens has spent most of his life in small towns, including Whittier, his current home. It is unlikely that any significant interest in children would have been overlooked by Stevens' neighbors, and yet neither his supporters nor his detractors have noted any interest Stevens had in a particular child or group of children. It does not appear that Stevens has ever served as a church or community youth leader or taken a special interest in any of his friends' children. In fact, based on the evidence in this case, Stevens appears indifferent to the children he might actually encounter and views any children that he might become responsible for as a threat to his independence.

Nor is there any evidence that Stevens ever transmitted or sent pornographic images to anyone or traded in such images. It is possible that Stevens' conduct might satisfy the elements of receiving as well as possessing child pornography. *See United States v. Norris,* 159 F.3d 926, 930 n. 4 (5th Cir.1998) ("Arguably, there is no meaningful distinction between the offenses of receiving and possessing child pornography"). Stevens certainly downloaded the images from AOL utilizing the phone lines. Given the circumstances surrounding his obtaining the images, the Government might have felt that Stevens was not aware of the exact nature of any particular images that the cryptic phrase "list me" would bring until he viewed them on downloading, and therefore he lacked scienter as to any specific visual image until that time. It appears that some of Stevens'

15. In *United States v. Hilton,* 999 F.Supp. 131 (D.Me.1998), the district court considered the effect of the amendments contained in the Child Pornography Prevention Act of 1996 to statutes penalizing simulated child pornography. *See* 18 U.S.C. § 2252A. The district court reasoned contrary to the Ninth Circuit in *Boos* that the aim of the amended statutes was to protect future victims of child pornography and not merely the actual persons depicted in the images and that prohibiting circulation of images depicting youthful appearing adults served that end. *See Hilton,* 999 F.Supp. at 134. *But see* 18 U.S.C. § 2252A(c) (affirmative defense that person depicted is adult). In this Court's view, *Hilton* is not persuasive because it raises all of the problems which the Supreme Court sought to avoid in *United States v. X–Citement Video, Inc.,* 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994), where it specifically held that the individual depicted must be a minor and the offender must know that the person is a minor before the offense is established. *Hilton* ultimately held that the amendments to the statutes rendered them overbroad and vague and therefore unconstitutional. *See* 999 F.Supp. at 135–37.

postings may have resulted in his receiving adult pornography and simulated child pornography.[16] It would not be unreasonable to distinguish the two offenses on this basis. Stevens never engaged in any conduct similar to ordering a specific image based upon a description of that image in a catalogue or even in an e-mail communication. Consequently, this Court concludes that Stevens is not clearly guilty of a more serious offense. In order to determine whether he is a heartland offender, it is necessary to compare his conduct to the harms identified by Congress.

Stevens is not one of the offenders for whom collection of child pornography is a supplement to the molestation of real children. For this reason, Stevens is simply not involved in one of the fundamental harms identified by the Supreme Court, namely, use of pornography to seduce child victims. *See, e.g., Rodriquez,* 741 P.2d at 1202 (illustrating how child molesters utilize pornography to seduce vulnerable children). By the same token, there is no evidence that Stevens ever produced any child pornography or distributed it to anyone else. As previously discussed, evidence presented at the hearing suggested that large-scale commercial production of child pornography has been virtually eliminated and current production appears to be a cottage industry. *See Osborne,* 495 U.S. at 143–45, 110 S.Ct. 1691 nn. 17 & 18 (Brennan, J., dissenting). There is no evidence that Stevens directly encouraged anyone connected with that cottage industry.

Testimony at the hearing also suggests that many if not all of the images possessed by Stevens were probably produced in the 1960s and 1970s, and many may have been produced much earlier and simply circulated in the deviant community ever since. While the Court recognizes that individuals are producing child pornography and distributing it on the internet even as it writes, current production would appear to be only a small percentage of the vast inventory already in existence. If Comstock could destroy over

three-million obscene pictures in the final years of the 19th century, then the total volume of such pictures that have accumulated in the interim must be truly overwhelming. It should be recognized that with the internet both the market and the sources of supply are truly world wide. Testimony at the hearing and in the materials submitted by the parties established that many pedophiles and other collectors of child pornography keep vast collections. This is a recurrent theme in affidavits submitted in support of search warrants.

It is not unreasonable to infer that such collections have been horded down through the years and passed around among the deviant population. The 1970 Commission on Obscenity and Pornography found that advances in photographic technology in the 1950s, probably referring in part to the Polaroid camera and photo duplication equipment, made circulation of existing stocks so cheap and easy that commercial production was not economic. Now duplication and transmission are even easier. Every picture in every collection throughout the entire world is now available for cheap computer duplication and transmission over the internet.

In the absence of evidence to the contrary, the Court has inferred as a matter of fact, that it is more probable than not that any specific image possessed by Stevens originated prior to 1977, the date when Congress first began regulating child pornography. It is instructive that many of the states emboldened by *Ferber* were enacting comparable statutes at the same time. Congress initially focused its efforts on production, imposing severe penalties on those producing child pornography, and later distribution. Unless we assume that Congress's efforts were unavailing, it is reasonable to infer that recruitment of new "victims" has lessened and fewer new images are being produced at the same time that circulation of existing images has greatly increased.[17]

---

**16.** The phrase "simulated child pornography" is used to refer to images that depict a youthful appearing adult. Many of the images possessed by Stevens would be prohibitable obscenity even if they depicted adults. It is not clear that re-

ceiving adult obscenity is a more serious offense than the one to which Stevens plead.

**17.** If there were three-million images available for distribution in the late 19th century and the

The question before this Court is not whether some harm has been done to the interests and victims that Congress wished to protect. For purposes of this decision, the Court must assume that harm has been done. Thus in defining the elements of the offense, Congress has looked to the age of the person depicted at the time the depiction took place. *See* 18 U.S.C. § 2256(9)(A)(i)(I). Stevens has plead guilty and been convicted. The Court's job at sentencing is to quantify the harm in order to divide offenders into appropriate categories based upon their culpability.

Stevens is one of a population of consumers of pornography whose collective efforts must be considered. Congress was clearly concerned about the total impact on the market of all possessors and did not limit its concerns to the incremental harm caused by a single possessor. The class of which Stevens is a member contributes to the harm in two ways: (1) encouraging, by their consumption, continued production of child pornography, and (2) encouraging, by their consumption, further distribution of the pornographic images once they are produced. While the Ninth Circuit in *Boos* minimized the importance of future victims, it did not eliminate that concern entirely, and given the legislative history of the statutes at issue, it would be difficult to do so. *See* 127 F.3d at 1209–13. In order to evaluate Stevens' culpability, it is necessary to examine how his conduct contributes to these additional harms.[18]

Unlike many, Stevens did not pay for the images either in cash or in kind through barter. Unlike many, Stevens did not carry on correspondences with producers and purveyors of the pornography. Stevens' encouragement was passive, apparently consisting of no more than using the code phrase "list me" in certain chat rooms operated by AOL where pornography was commonly distributed. It is not suggested that Stevens took an active part in the management of the chat rooms. By the same token, Stevens did not share his collection with others, or even disclose to others, as far as we know, that he had the collection. While Stevens' conduct certainly satisfied all the elements of the offense to which he plead, if we examine his proven conduct against the harms that Congress sought to prevent, it appears that Stevens' contribution to those harms was de minimis. No victim past, present or future is likely to be harmed solely or even significantly because of anything Stevens did or failed to do.

Certainly a primary harm identified by the Supreme Court and later by Congress was the fact that pornographic photographs and particularly photographs scanned into computers, duplicated and distributed worldwide create a permanent record of past abuse. So long as the images are in existence, the victims are being harmed. The offense is clearly a continuing offense. Nevertheless, this harm requires evaluation like any other harm.

A victim would be harmed in two ways. First, there exists the generic concern that pictures were taken and will always be in existence. The pictures Stevens received are

typical collector today has less than one-thousand images in his collection, then it would appear that the historical inventory would be sufficient to stock each person's collection. If this is true, then definition of the heartland should discriminate between those people who are in search of depictions of current children and those who are not. It appears from the literature that there are numerous men who are interested in images of real children with a real identity whom the offender might actually meet. Stevens is not in this category. The issue is not whether Stevens is a pedophile, but whether he has expressed an interest in current children and thus contributed however incrementally to the current abuse of children.

**18.** Special Agent Lanning testified to a related harm which he termed "validation." In his

view, each chat room constitutes a support group of like minded individuals. Each additional person who is willing to accept an e-mail transmission of child pornography serves to assure the sender that his actions are "ok" and that trafficking in child pornography is normal and not deviant behavior. From the standpoint of individual victims it might not matter that a given e-mail depicting her reached one-hundred rather than ten individuals, but from the standpoint of validation it would certainly encourage a given transmitter to know that one-hundred people and not only ten were interested in his transmissions. It is this consideration that will ultimately play a significant part in determining how great a departure is warranted by the facts of this case.

mass produced. He received them as part of mass mailings through the chat rooms. The incremental harm he has caused any specific person pictured is de minimis. Even if Stevens had destroyed his collection, the same images would be continuously available. Therefore the harm caused by Stevens' possession only minimally contributed to creating a record of past abuse.

The second kind of harm and the most significant in the testimony of witnesses who have actually raised the issue in court before me is the risk that victims will encounter people who can identify them from pictures.[19] This is a source of great fear and embarrassment to affected individuals. The older the picture and the more the victim has changed in appearance during the interim, the less likely that the victim could be currently recognized or would believe that he or she could be currently recognized from the photographs in question. It appears likely that most of the pictures in Stevens' possession are more than twenty years old. It is unlikely that any persons pictured in those images would fear that they could be recognized from them today. The fact that none of the pictures involve people that Stevens knew or that knew him is significant. Thus, unlike many cases with which this Court has dealt, there is no context connecting Stevens to a specific victim to aid third parties—specifically close friends or associates of the victim—who might come into possession of Stevens' collection to recognize that victim.

How do we define the heartland of the offense? Congress's purpose in banning private possession of child pornography was primarily to protect current children from present exploitation. The victim of an offense like Stevens' is not society as a whole or even children who will be exploited in the future, but the actual children portrayed in the images. See Boos, 127 F.3d at 1213; United States v. Hibbler, 159 F.3d 233 (6th Cir.1998); United States v. Rugh, 968 F.2d 750 (8th Cir.1992).[20] But see United States v. Toler, 901 F.2d 399 (4th Cir.1990). If the purpose of the legislation is the protection of present children and the specific children to be protected are the children pictured in the images, and by reasonable extension those who will be harmed by anyone influenced by the willingness of the possessor to possess, then at the heartland of the Sentencing Guideline are those offenders who exploit victims who are currently children by in effect encouraging child pornography's production so that they can receive and possess it. See, e.g., United States v. Tagore, 158 F.3d 1124 (10th Cir.1998).

In Tagore, the defendant joined a chat room, helped develop its charter and while never producing child pornography himself, actively conversed with those that did and traded the resulting images. While the defendant in Tagore was convicted of more serious offenses than Stevens, the discussion of chat room operation in Tagore helps to define the heartland for possession offenses. Clearly the kind of conduct described by chat room participants where there were actual

---

**19.** In the 1970s when I handled a great number of divorces it was not uncommon for a witness to testify that during the course of marriage the witness had consented to having his or her spouse videotape the two in sexual activity presumably for their private enjoyment and not to be shared with others. When the marriage was breaking up it was not uncommon for one spouse to threaten to circulate such tapes among the parties' friends, acquaintances and co-workers in order to injure the other spouse. It was clear from the demeanor of the testifying witnesses that they viewed such actions with horror. The witness's horror was in significant part attributable to the fear that viewers of the tape would recognize the participants and think less of them.

**20.** It appears that these cases are correct in so analyzing Congressional intent. If there is a defect in the reasoning of these cases it is in the implicit assumption that the people depicted in the pictures are children at the time the possessor receives them. In other words, that production, distribution, reception and possession of these images are relatively contemporaneous acts. In fact, as previously discussed, most of the pictures presently being distributed were probably produced prior to 1977. The cause of an effect must precede it. It is difficult to see how anything Stevens did in 1995 "caused" any actions in 1977 or any actions before that time. In a sense, Stevens contributed to causing the specific distributions of the images in which he participated by signaling that his name should be added to an e-mail list in the period from 1995 to 1997, but the incremental harm his actions caused to children victimized in 1977 is de minimis.

on-line conversations regarding the exploitation of specific children serves to bring the possession guideline into synchronization with the harms which Congress has identified. In contrast, Stevens did not converse with anyone about the images to be delivered to him, and it is more probable than not that as a result he received images that are at least twenty years old.

It seems that Congress clearly intended to stamp out child pornography if possible and believed that attacking the market for such materials was necessary to achieve that goal. It is also clear that Congress set its net very wide for that purpose to assure that those primarily responsible for the production and distribution of child pornography could not escape through evidentiary loop holes. While it might be possible to differentiate between images produced in 1890 and those in 1990, it would probably be much more difficult to differentiate images produced in 1977 from those produced in 1995. Thus the statute clearly prohibits possession of child pornography from 1900 to assure conviction of those possessing child pornography produced in 1998 if identified and apprehended.

Congress has, however, provided a relatively short maximum sentence for those first offenders convicted of possessing child pornography—five years. Consequently, worst offenders, heartland offenders and least offenders will all receive a sentence of five years or less. Since most pornography would appear to be transmitted via computer, most individuals caught will probably have more than ten images in their collection, and most will probably have some pre-school children depicted in that collection. The practical range of sentences will therefore be triggered by an Offense Level of 21 $(15+2+2+2)$, less three for acceptance of responsibility in the event of a plea for an Offense Level of 18, which for a Criminal History Category of I yields a range of twenty-seven to thirty-three months. The effective minimum sentence without departure for a first offender convicted of a heartland offense will therefore be forty-five percent of the maximum sentence.

It is clear that Congress wanted possessors of child pornography to be identified,

prosecuted, convicted and sentenced to prison for a reasonable time. It is less clear that Congress intended that the least offender within the class of possessors should receive a sentence almost half as large as the most serious offender. Viewed in this way, it seems clear that the Sentencing Commission has addressed distinctions between producers, transmitters and possessors, but has not adequately addressed differences within the residual or default class of mere possessors. An examination of the reported cases, considered against the background of the testimony in this case and the various commission reports dealing with pornography and the legislative history of the statutes, leads this Court to conclude that there are significant differences between the conduct of the various individuals who are guilty of mere possession and that the Sentencing Guidelines do not adequately address those differences.

The Court is therefore prepared to find that while Stevens is clearly a member of the class of offenders, he is a least offender. Stevens is outside the heartland of offenders who, by virtue of their conduct, must have contributed to a greater extent to the harms Congress sought to prevent. This determination justifies a downward departure. *See Sanchez–Rodriguez*, 161 F.3d 556. Recognizing that where a given defendant's actual offense is de minimis when compared to other offenders, and the trial court concludes on that basis that his actions are of a kind or of a degree that renders them outside the norm of other offenders committing other offenses, it is proper to depart. This is so even if the offender unquestionably committed the offense and his conduct satisfies all of the offense's elements and in addition the Sentencing Guidelines linguistically apply to his situation.

Here, the Guidelines do address distinctions between producing, distributing and possessing child pornography. The Guidelines do not take the further step and differentiate within the class of mere possessors based upon the likely harm they will do to the class of victims Congress wishes to protect. Examining the conduct of the various defendants discussed in the reported cases, it is clear that virtually all have made greater

efforts to involve themselves with producers and distributors of child pornography (or undercover operators posing as producers and distributors) than Stevens did. If any of the chat rooms frequented by Stevens had stressed the availability of recently created child pornography, then perhaps the result would be different.

### ADDITIONAL BASES FOR DEPARTURE

Stevens asks this Court to find two additional or substitute bases for downward departure, both of which demand this Court's attention. *See United States v. Ramos–Oseguera,* 120 F.3d 1028, 1029 (9th Cir.1997) (holding each proposed basis for a downward departure must be separately addressed and considered).

#### 1. *Aberrant Behavior*

■ First, Stevens contends that his actions in collecting over three-hundred separate images of child pornography over an eighteen month period constitute aberrant behavior under standards adopted by the Ninth Circuit. *See* U.S.S.G. Ch. 1, Pt. A, Intro. 4(d) ("The Commission, of course, has not dealt with the single acts of aberrant behavior that may still justify probation at higher offense levels through departures."). Stevens relies upon, among other sources of authority, *United States v. Fairless,* 975 F.2d 664 (9th Cir.1992) and *United States v. Takai,* 941 F.2d 738 (9th Cir.1991). Recent cases, however, have explained the holding of *Takai. See United States v. Colace,* 126 F.3d 1229, 1231–32 (9th Cir.1997); *United States v. Pierson,* 121 F.3d 560, 563–64 (9th Cir. 1997). In *Colace,* the Ninth Circuit set out a number of factors which a sentencing court faced with a claim of aberrant behavior must address. *See* 126 F.3d at 1231 n. 2. Applying those factors to this case, it appears that most either militate against an aberrant behavior departure, or cannot be determined on the existing record.

While Stevens is a first offender, he did not commit a single criminal act. Each time he downloaded an image of a different child he committed a separate crime and arguably injured a separate victim. *See Boos,* 127 F.3d at 1210. The offenses were not spontaneous or unplanned, but continued over a significant period of time. Stevens' motivations for committing the crime are unclear. Stevens was interviewed by a psychiatrist and a psychologist and neither believed his explanation for committing the crime. This Court is equally in doubt. While it is possible that Stevens is suffering from a psychological disorder related to collecting child pornography, and that such disorder subjected him to substantial pressure, the Court is unable to draw this conclusion. Finally, the Court did receive letters from Stevens' friends and family expressing shock at his behavior, but that would virtually always be the case with the collection of child pornography because it is a deviant behavior and most deviant people keep such behavior secret. True, Stevens has been an exemplary hard working citizen throughout his life and prior to the institution of the Sentencing Guidelines would probably have received probation on that basis, but the Guidelines specifically preclude such socio-economic considerations from influencing a sentence. *See* U.S.S.G. §§ 5H1.5, 5H1.6 and 5H .10. *See also United States v. Duerson,* 25 F.3d 376 (6th Cir.1994).

Finally, and most important given the testimony in this case and particularly that of Special Agent Lanning, the positive aspects of Stevens' life and relationships are really not inconsistent with being a collector of pornography.[21]

#### 2. *Significantly Reduced Mental Capacity*

■ Mental and emotional conditions are ordinarily not relevant in determining whether a sentence should be outside the applicable Sentencing Guideline range. *See*

---

**21.** Dr. Harper did testify that Stevens' eight year relationship with Ms. Eusden and the testimony of both that theirs was a mutually rewarding sexual relationship was inconsistent with typical collectors of pornography. *But see* Commission–70 at 157–66 (where the majority of the pornog-

raphy collectors who would submit to interviews gave the same report). This Court is not convinced that these reports are true and therefore tends to discount but not reject expert opinion based upon their truth.

U.S.S.G. § 5H1.3. An exception permits a downward departure if a defendant suffers from significantly reduced mental capacity that contributed to the commission of his or her offense. *See id.* § 5K2.13.[22] Stevens asks for a departure on this basis, relying primarily upon a report from Dr. Harper.

Dr. Harper initially credited Stevens' explanation that he was not erotically affected by the pornography he collected, but simply was engaged in a quest to explore AOL to find the bizarre and the unusual. At the final sentencing hearing, however, Dr. Harper was more guarded in this regard. Dr. Harper interviewed both Stevens and Ms. Eusden and accepted their statements that they had a full and typical sex life and looked to one another to fulfill sexual needs. Based on these conclusions, Dr. Harper found that Stevens was compulsive in his on-line forays and that this compulsive aspect of his personality explained why he would spend more than a full year haunting chat rooms to collect pornography.

Dr. Harper made it clear that he did not mean to indicate that Stevens suffers from any mental illness including Obsessive–Compulsive Disorder or a lesser degree of Obsessive–Compulsive Personality Disorder not amounting to a full personality disorder.

*Compare* Diagnostic and Statistical Manual of Mental Disorders–IV ("DSM–IV") § 300.3 at 417–23 (4th ed.1994), *with* DSM–IV § 301.4 at 669–72. In context, Dr. Harper was clearly speaking of compulsions, not obsessions. DSM–IV § 301.4 appears more likely than DSM–IV § 300.3 because its diagnostic features seem to best describe Stevens as seen by Dr. Harper. For example, it does not appear that Stevens' collection of pornography caused him any "marked distress," or that the collection efforts interfered with Stevens' normal routine, occupational functioning, or usual social activities or relationships with others, though clearly it was time consuming. Nor does it appear that Stevens' ability to engage in cognitive tasks was compromised. *See id.* § 300.3 at 419. On the other hand, as described by Dr. Harper, Stevens does meet some of the criteria of DSM–IV § 301.4. However, even here Stevens has more characteristics that do not conform to the diagnosis than those which do. For example, Stevens appears to have a very full leisure life apart from his work—he sails, skis and enjoys the outdoors. It also appears that collecting pornography would be inconsistent with the scrupulous morality typically exhibited by people with this disorder. *See id.* § 301.4 at 670.[23]

**22.** The "Diminished Capacity" Guideline is of no bearing if the decrease in mental capacity is caused in whole or in part by alcohol or drug abuse, if the crime is one of violence, or if the offender's criminal history requires his incarceration to protect the public. *See* U.S.S.G. § 5K2.13. There is no evidence of excessive use of alcohol or drugs or that either played any part in "causing" Stevens to collect pornography. Stevens has no prior criminal history. Whether collecting child pornography is a "crime of violence" will be addressed in the text of this order as will the need to incapacitate Stevens by incarcerating him to protect the public.

**23.** The Court has not addressed "paraphilias" in the text of this decision because no one suggests that Stevens is suffering from a paraphilia. *See* DSM–IV § 302.70 at 522–25. Both Dr. Harper and Dr. Rothrock ruled out one form of paraphilia, pedophilia. They did not specifically address another paraphilia wherein the person affected would forego or significantly limit an adult sexual relationship with a partner and turn exclusively or primarily to pornography for arousal and masturbation for release. This would seem to describe the defendant in *United States v. McBroom,* 124 F.3d 533 (3rd Cir.1997). Long

before he began collecting child pornography through the internet, McBroom wasted hours hanging out in peep shows and adult book stores. His actions clearly affected his marriage. Such a person might truly be a compulsive collector of pornography. There is no evidence that Stevens had any interest in child pornography prior to 1995.

The testimony of Stevens and Ms. Eusden is inconsistent with a diagnosis of paraphilia. There is some circumstantial evidence that would support a finding of such a paraphilia— the number of images downloaded, the period of time during which the downloading took place and most important, a fact noted by both mental health practitioners, that Stevens was not emotionally or morally repelled by images of children being tortured and subjected to various extreme indignities such as bestiality. If Stevens did not view the children pictured in the images as "real" and the experiences depicted as "real," but simply used the images as an aid to fantasy and a stimulus to masturbation as a substitute for interpersonal sexual relations, that would explain his relative indifference to the horror portrayed in a number of the images that he not only downloaded but retained. Fixation

In presenting his significantly reduced mental capacity argument, Stevens principally relies upon *United States v. McBroom*, 124 F.3d 533 (3rd Cir.1997), and also finds some support in *United States v. Cantu*, 12 F.3d 1506 (9th Cir.1993). *McBroom* establishes that collection of child pornography is a "nonviolent" crime for purposes of this Guideline because its elements do not contain a requirement that the offender used, attempted to use, or threatened to use force. *Cantu* would be in accord though it is not a child pornography case. This Court agrees. Even if this Court were to apply the more case-specific criteria for finding a non-violent offense, *see McBroom*, 124 F.3d at 542–44, it would find Stevens' offense nonviolent because he never had any contact with any of the victims of his offense and played no part in the production or distribution of child pornography. Under Ninth Circuit precedents, "significantly reduced mental capacity" does not require a major mental illness or a defect in rationality. *See Cantu*, 12 F.3d at 1512–13. Any cognitive or volitional impairment will do. *See McBroom*, 124 F.3d at 548–49. In determining whether the mental impairment contributed to the offense and, if so, how great a departure is warranted, the court should not look for "but for" causation, but should be prepared to depart if the mental impairment contributed in any manner to the offense, and in making this determination, the sentencing court should be lenient.

Nevertheless, this Court is not able to grant a departure on the basis of significantly reduced mental capacity. First, Dr. Harper's testimony does not establish or even suggest either a cognitive or volitional impairment. There is no evidence that Stevens is unable to absorb information in the ordinary way or that he is in any way "impaired" in conforming his behavior to the law.[24] Part of this lack of evidence is traceable to the fact that Stevens was not forthcoming with either mental health practitioner. This Court agrees with Dr. Rothrock that Stevens' explanation for his actions is not credible. Clearly, Stevens need not show a mental illness or a condition recognized in DSM–IV to earn a departure. He must, however, show that his mental condition significantly reduced his capacity and contributed in some way to his offense. Stevens has not made that showing.[25]

### SCOPE OF DEPARTURE

At one time the Ninth Circuit took the view that a trial judge contemplating a departure must adjust the extent or magnitude of the departure to some analogous Guideline. The circuit court now recognizes that such a categorical rule is inappropriate. *See United States v. Green*, 152 F.3d 1202, 1209 (9th Cir.1998); *United States v. Sablan*, 114 F.3d 913, 919 (9th Cir.1997) (en banc), *cert. denied*, —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). Instead, the trial court is directed to act reasonably and explain its actions. The best framework for such action and explanation is found in 18 U.S.C. § 3553(a).

Rehabilitation and reformation are important criteria but difficult to apply in this case.

---

on pornography rather than "real" children would also explain why Stevens has never shown much interest in real children or their activities. Such a paraphilia might qualify for a downward departure under U.S.S.G. § 5K2.13, but there are insufficient facts to support such a finding. Stevens denies any sexual stimulation from the images and, with Ms. Eusden, reports a mutually satisfactory adult interpersonal sexual relationship. No mental health professional diagnosed Stevens as having a paraphilia related to pornography.

24. Dr. Harper did not testify that Stevens had a compulsion or obsession about child pornography. Dr. Harper testified that in general Stevens manifested compulsive personality traits that served to explain his general adjustment. Once Stevens started doing something he would tend to continue until he finished. Dr. Harper was not able to relate these personality characteristics in any meaningful way to explain why Stevens downloaded pornography as opposed to some other interesting items he encountered on AOL, or why Stevens forwent adult pornography in favor of child pornography.

25. A person's mental capacity must be significantly reduced. In relation to what? The offenders functioning at other times? In other contexts? In relation to heartland offenders? The Guideline does seem to suggest that mental capacity must be "significantly reduced" in relation to other offenders similarly situated, but that decision is not controlling here because Stevens really produced no evidence that his mental capacity was significantly reduced in other respects.

On the one hand, Stevens has never been convicted of a crime, has been employed throughout his adult life, and apparently has a solid relationship with his significant other. On the other hand, all of these factors were in place during the approximately eighteen months Stevens was building his collection of child pornography. While there is no evidence that Stevens ever collected or sought out pornography prior to 1995, there is no compelling explanation in the record for why he did so beginning in 1995. The Court has carefully considered the testimony of both Dr. Harper and Dr. Rothrock and believes they are as uncertain as this Court. A significant part of that uncertainty stems from the fact that Stevens has not given a credible explanation of his conduct.

Deterrence of self and others are also important criteria. Congress clearly saw prosecutions for mere possession of child pornography as part of a strategy aimed at preventing child sexual abuse. We do not fully understand the population of non-pedophiles who possess child pornography, if in fact there is such an identifiable population, and to that extent have difficulty determining what would deter them. The 1970 Commission on Obscenity and Pornography attempted to study the subject population, or at least that part of it that consumed adult pornography, and concluded that those involved appeared very ashamed of their actions and acted furtively as a consequence when researchers attempted to contact them. *See* Commission–70 at 157. Given the community outrage at such conduct, and the hatred for anyone whose sexual interests differ from the norm, it would appear that mere exposure and prosecution would be sufficient to deter both Stevens and those similarly situated from further activity.[26]

Isolation and incapacitation do not appear to be particularly important factors in this case. Without his computer, it does not ap-

pear that Stevens would offend again. He does not seem a present danger to potential victims of the sexual abuse recorded in child pornography.

Retribution and affirmation of community norms are very important criteria. Clearly Congress wanted to stamp out child pornography and cast its net very wide to assure maximum impact. It is instructive that affirmation of community norms, the so called expressive or educative function of punishment, *see* Joel Feinberg, *The Expressive Function of Punishment, in* A READER ON PUNISHMENT 71 (Anthony Duff & David Garland eds., Oxford Univ. Press 1994), is included in 18 U.S.C. § 3553(a)(2)(A). It is clear that Congress wished to condemn the possession and collection of child pornography without regard to the actual instrumental or utilitarian effect that condemnation had on actual collectors. Congress was not indifferent to deterrence but it was not willing to limit itself to deterrence. Thus Congress recognized the point Special Agent Lanning made in his testimony, that the greatest evil accompanying the circulation of child pornography was the validation which acceptance, discussion and trading in such materials gave to the conduct of those who produced it. Community condemnation and the reaffirmation of community norms through imposition of serious penalties was Congress's way of undermining that validation and assuring that the community at large would understand that it is not acceptable to take pleasure in images depicting crimes committed against helpless children. *See* TRIBE, AMERICAN CONSTITUTIONAL LAW § 12–16 at 915 n. 71.

In discussing related offenses, Judge Noonan stated the issue forcefully, "when a child is made the target of the pornographer-photographer, the statute will not suffer the insult to the human spirit, that the child should be treated as a thing." *See United*

---

**26.** A review of the community responses from Whittier presented by both sides bears this out. A significant number of Stevens' neighbors view him with loathing and disgust despite knowing him personally and never having had bad relations with him in the past. On the other hand, the offense is one committed in the privacy of the home, and the supervised release condition authorizing spot searches which would extend to

any computer on the premises would probably also serve to deter further illegal actions. It does not appear that Stevens ever collected pornography before he bought his computer. Confiscation of the computer would appear an effective deterrent. *See United States v. Ownby*, 926 F.Supp. 558 (W.D.Va.1996) (discussing 18 U.S.C. § 2253 and forfeiture in child pornography cases).

*States v. Wiegand,* 812 F.2d 1239, 1245 (9th Cir.1987). Judge Noonan did not mention Immanuel Kant, but he echoes an important variation on Kant's categorical imperative, that we must view all of the men and women with whom we come in contact as ends, never as means to our ends. *See* BRENDAN E.A. LIDDELL, KANT ON THE FOUNDATION OF MORALITY—A MODERN VERSION OF THE GRUNDLEGUNG 152–57 (Indiana Univ. Press 1970). The most disturbing aspect of this case remarked upon by both Dr. Harper and Dr. Rothrock, is Stevens' emotional distance from the children—some of them literally being tortured—that are depicted in the image files kept on his hard drive. Clearly, any sentence imposed in this case must "invalidate" such behavior and reaffirm the community norm that all children are worthy of respect and entitled to be considered as "ends" and not merely as a means to the ends of others.

Stevens has asked for a probationary sentence. Probation is inappropriate for a number of reasons. First, the sheer mass of Stevens' collection—over three-hundred separate images—counsels caution. Second, Stevens' conduct occupies the borderland between receipt and possession. *See United States v. Romualdi,* 101 F.3d 971 (3rd Cir. 1996). He clearly received as well as possessed images downloaded from AOL. While scienter is a problem and Stevens may have been in doubt regarding the result of sending the message "list me" when he first began, it is difficult to argue that eighteen months and some three-hundred plus images later he was still in doubt. More troublesome, many of the images Stevens collected involved depictions of sadism and cruelty. Congress considers such pictures particularly offensive. This was also the conclusion of the Attorney General's Commission on Pornography in 1986. Finally, the record does not leave the Court with a clear understanding of the part child pornography plays in Stevens' overall mental and emotional makeup, thus complicating any prediction regarding the likelihood of recidivism.

This is a difficult case. Congress has cautioned this Court to impose a penalty sufficient but no greater than is necessary to comply with the purposes discussed above. *See* 18 U.S.C. § 3553(a). This Court concludes that a three-level downward departure pursuant to U.S.S.G. § 5K2.0 and 18 U.S.C. § 3553(b) is appropriate under the facts of this case. *See* U.S.S.G. Ch. 1, Pt. A, Intro. 4(b). This departure results in a sentencing range of twelve to eighteen months. A sentence at the low end will be sufficient, but no greater than what is necessary to serve the goals identified in 18 U.S.C. § 3553(b).

**IT IS THEREFORE ORDERED:**

The Court will grant a three-level downward departure pursuant to U.S.S.G. § 5K2.0 and 18 U.S.C. § 3553(b). *See* U.S.S.G. Ch. 1, Pt. A, Intro. 4(b).